## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WEAVER'S COVE ENERGY, LLC<br>1 New Street<br>Fall River, MA 02720,<br><br>*Plaintiff,*<br><br>vs.<br><br>THAD W. ALLEN, Commandant of the<br>United States Coast Guard, in his official<br>capacity<br>United States Coast Guard Headquarters<br>2100 2nd Street, SW<br>Washington, DC 20593,<br><br>HALA ELGAALY, Chief, Bridge<br>Administration Division, United States<br>Coast Guard, in her official capacity,<br>(same address as above)<br><br>-and-<br><br>TIMOTHY S. SULLIVAN, Commander,<br>First Coast Guard District, United States<br>Coast Guard, in his official capacity,<br>408 Atlantic Avenue<br>Boston, MA 02110-3350<br><br>*Defendants* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>    No. _____ |

## PETITION FOR A WRIT OF MANDAMUS PURSUANT TO THE MANDAMUS ACT AND COMPLAINT FOR JUDGMENT AND RELIEF PURSUANT TO THE DECLARATORY JUDGMENT ACT

Comes now Plaintiff, Weaver's Cove Energy, LLC ("Weaver's Cove"), by and through

its attorneys, Baker Botts L.L.P., and by this Petition and Complaint alleges the following:

1.    Weaver's Cove has received authorization from the Federal Energy Regulatory

Commission ("FERC") under Section 3 of the Natural Gas Act of 1938 ("Natural Gas Act"), as

amended, 15 U.S.C. § 717b, to construct, own, and operate a facility ("Terminal") in Fall River,

Massachusetts, for the importation and regasification of liquefied natural gas ("LNG") from

overseas. This regasified LNG will be available for distribution to natural gas consumers,

including utilities and electric power generators throughout the New England states. The

Terminal will be comprised of an LNG ship berth and unloading equipment, LNG storage tank,

and regasification facility on Weaver's Cove's property located on the east bank of the Taunton

River in Fall River, Massachusetts. In addition, LNG will be trucked to provide LNG to LNG

storage facilities located throughout New England. The FERC, which is the federal agency

vested with exclusive siting authority for LNG import terminals under the Natural Gas Act, *see*

15 U.S.C. § 717b(e)(1), determined that Weaver's Cove's project would promote the public

interest by increasing the availability of natural gas supplies in New England, and approved the

project subject to certain conditions. *See Weaver's Cove Energy, LLC,* 112 FERC ¶ 61,070

(2005).

2.     LNG is natural gas that is cooled to a liquid state at a temperature of minus 260

degrees Fahrenheit. By cooling natural gas to a liquid, its volume shrinks by a factor of

approximately 600, such that it can be loaded economically and efficiently on specially-designed

LNG tankers and transported from foreign sources to U.S. markets. The LNG is then warmed

and returned to a gaseous state in vaporizers and injected into the interstate U.S. natural gas

pipeline grid.

3.     LNG will be delivered to the Terminal in specially-designed tankers transiting

through the Federal Navigation Channel in Narragansett Bay in Rhode Island and Mount Hope

Bay in Massachusetts, and finally up the Federal Navigation Channel in the Taunton River.

Weaver's Cove has sought a Letter of Recommendation ("LOR") from the U.S. Coast Guard

("Coast Guard") pursuant to the Port and Waterways Safety Act, 33 U.S.C. § 1221 *et seq.*, and 33 C.F.R. § 127.009, finding that the waterway is suitable for the proposed transit of the LNG tankers to the Terminal.

4.      The subject of the present action is an old drawbridge (constructed in 1906) that spans the Federal Navigation Channel of the Taunton River between Fall River and Somerset, Massachusetts (the "Old Brightman Street Bridge" or "Old Bridge"), and lies approximately 4,500 feet downstream of the Weaver's Cove terminal site.  The Old Bridge is part of the Massachusetts state highway system and is owned, operated, and maintained by the Commonwealth of Massachusetts through the Massachusetts Highway Department.

5.      While the Old Bridge is in place, tankers delivering LNG to the Terminal would have to transit through the Old Bridge, a bascule bridge with two movable sections that open vertically to create a passage through the bridge span with unlimited vertical clearance.  The piers supporting the bascules of the Old Bridge are 98 feet apart and are positioned on the western-most edge of the roughly 400 foot wide Federal Navigation Channel leading up to and away from the bridge.  When the drawbridge is in an upright position, the Coast Guard has stated that the operational horizontal clearance at the opening of the bridge is 80 feet.  *See* ¶ 43, *infra*. Photographs of the Old Bridge in the open and closed positions are attached to this Petition and Complaint and incorporated as Exhibit A.

6.      After well over a decade of planning, a new replacement bascule bridge spanning the Taunton River between the Cities of Fall River and Somerset ("New Brightman Street Bridge" or "New Bridge") has been authorized by the Coast Guard approximately 1,500 feet upstream of the Old Bridge.  The New Bridge is currently under construction by the

Massachusetts Highway Department, and the pier supports and all in-water structures associated with the New Bridge have already been completed and put in place. The 200 foot wide opening of the New Bridge is centered on the existing approximately 400 foot wide Federal Navigation Channel.

7.    The pier supports of the New Bridge in the center of the existing Federal Navigation Channel are not aligned with those of the Old Bridge which are located on the western edge of the Channel.

8.    The Coast Guard, by its own admission, has previously determined the Old Bridge to be a hazard to navigation. *See* Letter from Hala Elgaaly, P.E., Chief, Bridge Administration Division, U.S. Coast Guard, by direction of the Commandant, to Ted Gehrig, President, Weaver's Cove Energy, LLC (Oct. 4, 2007), at 2 ("October 4 Letter"). A true and correct copy of the October 4 Letter is attached to this Petition and Complaint and incorporated as Exhibit B.

9.    Despite this determination, the Coast Guard has not held a public hearing as required by Section 3 of the Truman-Hobbs Act, 33 U.S.C. § 513 *et seq.*, has not undertaken a "Detailed Investigation" of the Old Bridge as required by 33 C.F.R. § 116.20, and has not prepared a "Preliminary Investigation Report" or rendered a "Preliminary Decision" as required by 33 C.F.R. § 116.15.

10.    By this lawsuit, Weaver's Cove petitions this Court to issue a writ of mandamus to the Commandant of the Coast Guard commanding and directing him to carry out his statutory duty set forth in Section 3 of the Truman-Hobbs Act, which requires him to hold a public hearing at which interested parties "shall have full opportunity to offer evidence and be heard as to

whether any alteration of [the Old Bridge] is needed, and if so what alterations are needed." *See* 33 U.S.C. § 513 (stating "[w]henever any bridge shall, in the opinion of the [Commandant], at any time unreasonably obstruct such navigation, it *shall be the duty* of the [Commandant] . . . to hold a hearing" (emphasis added)).

11.    Weaver's Cove further petitions this Court to issue a writ of mandamus to two of the Defendants commanding and directing them to follow the procedures set forth in Part 116 of the regulations promulgated pursuant to the Truman-Hobbs Act, to determine if the Old Bridge is an unreasonable obstruction to navigation, and if so, what alterations should be required. *See* 33 C.F.R. Part 116. Specifically, Weaver's Cove petitions this Court to direct and command the Chief of the Bridge Administration Division (formerly the Office of Bridge Administration), and the First District Commander, to undertake a "Detailed Investigation" of the Old Bridge, *see* 33 C.F.R. § 116.20, or, in the alternative, to prepare and issue a "Preliminary Investigation Report," together with the recommendation whether to conduct a "Detailed Investigation," and to render a "Preliminary Decision," all as required by 33 C.F.R. § 116.15.

12.    Finally, because Defendants, in the October 4 Letter, have invoked Section 1948 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109-59, § 1948, 119 Stat. 1143, 1514 (2005) ("SAFETEA-LU"), as the sole excuse for their failure to fulfill their responsibilities under the Truman-Hobbs Act and the regulations promulgated thereunder, Weaver's Cove respectfully requests this Court to declare that Section 1948 of SAFETEA-LU does not prevent or excuse Defendants from fulfilling their statutory responsibility under the Truman-Hobbs Act and related Coast Guard regulations with respect to the Old Bridge. Specifically, Weaver's Cove prays this Court declare that Section 1948 does not

excuse or otherwise prevent Defendants from holding the public hearing required by Section 3 of the Truman-Hobbs Act, or complying with the Part 116 process with respect to the Old Bridge.

## I.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Weaver's Cove's claims arise under the laws of the United States.

14.    This Court also has subject matter jurisdiction over this action pursuant to the Mandamus Act, 28 U.S.C. § 1361, because the Defendants have failed to perform the duty required of them by the Truman-Hobbs Act, 33 U.S.C. § 511 *et seq.*, and the regulations promulgated thereunder, 33 C.F.R. Part 116. *See, e.g., Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 366 F. Supp. 51, 57 (D.D.C. 1973); *Carson v. U.S. Office of Special Counsel,* 514 F. Supp. 2d 54, 57 (D.D.C. 2007).

15.    This Court is empowered to issue writs of mandamus in this action pursuant to the Mandamus Act, 28 U.S.C. § 1361.

16.    This Court is also empowered to provide declaratory relief in this action pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure.

17.    This Court is also empowered to provide the relief requested herein under the Administrative Procedure Act, 5 U.S.C. § 501 *et seq.*

18.    Venue is proper in this Court under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district, and because

the Defendants either perform their official duties in this district or are supervised by agency officers or employees performing their official duties in this district.

19.     Venue is also proper in this Court under 28 U.S.C. § 1361, which gives the district courts original jurisdiction over any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

## II.    PARTIES

20.     Plaintiff Weaver's Cove is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Fall River, Massachusetts.

21.     Defendant, Admiral Thad W. Allen (the "Commandant"), is sued in his official capacity as Commandant of the United States Coast Guard, an agency of the United States. Under the Truman-Hobbs Act, 33 U.S.C. § 511 *et seq.*, Defendant, Commandant, has the responsibility to ensure that no bridge unreasonably obstructs the free navigation of any navigable water of the United States. *See* 33 U.S.C. § 512. Authority to order the alteration of an unreasonably obstructive bridge to meet the reasonable needs of navigation pursuant to the Truman-Hobbs Act was transferred to the Department of Homeland Security by 6 U.S.C. § 552(d). This authority was in turn delegated by the Secretary of Homeland Security to the Commandant by Department of Homeland Security Delegation Number 0170.1.

22.     Defendant, Hala Elgaaly, P.E. (the "Chief"), is sued in her official capacity as the Chief of the Bridge Administration Division (formerly the Office of Bridge Administration) of the United States Coast Guard. Under 33 C.F.R. § 116.01 *et seq.*, Defendant, Chief, has been delegated the responsibility to authorize investigations of bridges that may be unreasonable

obstructions to navigation and to make determinations whether bridges constitute unreasonable obstructions to navigation pursuant to the Truman-Hobbs Act.

23.     Defendant, Rear Admiral Timothy S. Sullivan (the "District Commander" or "First District Commander"), is sued in his official capacity as the Commander, First Coast Guard District.   Defendant, District Commander, has command over the First Coast Guard District, in which the Old Bridge is located and, under 33 C.F.R. Part 116, has been delegated the responsibility to conduct investigations to determine whether a bridge constitutes an unreasonable obstruction to navigation pursuant to the Truman-Hobbs Act.

### III.    APPLICABLE LAW

**Statutory and Regulatory Background**

**The Truman-Hobbs Act**

24.     The Truman-Hobbs Act, 33 U.S.C. § 511 *et seq.*, requires that "[n]o bridge shall at any time unreasonably obstruct the free navigation of any navigable waters of the United States." 33 U.S.C. § 512.

25.     The Commandant, through designation by the Secretary of Homeland Security, is charged with ensuring that no bridge unreasonably obstructs the navigable waters of the United States in contravention of the Truman-Hobbs Act.   *See* 33 U.S.C. § 513 (providing that the Secretary of Transportation shall be responsible for enforcing the Truman-Hobbs Act); 6 U.S.C. § 552(d) (transferring, *inter alia*, the Secretary of Transportation's Truman-Hobbs Act responsibilities to the Secretary of Homeland Security); Department of Homeland Security Delegation Number 0170.1 (delegating the Secretary of Homeland Security's Truman-Hobbs Act responsibilities to the Commandant of the U.S. Coast Guard).

26.    The Truman-Hobbs Act further requires:

> Whenever any bridge shall, in the opinion of[, by delegation, the Commandant], at any time unreasonably obstruct such navigation, it *shall be the duty* of the [Commandant], after notice to interested parties, to hold a hearing at which the bridge owner, those interested in water navigation thereunder or therethrough, those interested in either railroad or highway traffic thereover, and any other party or parties in interest shall have full opportunity to offer evidence and be heard as to whether any alteration of such bridge is needed, and if so what alterations are needed, having due regard to the necessity of free and unobstructed water navigation and to the necessities of the rail or highway traffic.

33 U.S.C. § 513 (emphasis added). Under the Coast Guard's regulations, the Commandant shall hold such a hearing "[w]henever the Coast Guard has *good reason* to believe that a bridge . . . is an unreasonable obstruction to navigation." 33 C.F.R. § 116.01(d) (emphasis added).

27.    The Truman-Hobbs Act requires that if, after such hearing, the Commandant "determines that any alterations of such bridge are necessary in order to render navigation through or under it reasonably free, easy, and unobstructed, . . . he shall so find and *shall issue . . . an order requiring* such alterations of such bridge as he finds to be reasonably necessary for the purposes of navigation." 33 U.S.C. § 513 (emphasis added). *See also* 33 C.F.R. § 116.01(c) ("If any bridge unreasonably obstructs navigation, the Commandant . . . *will order* the alteration of that bridge." (emphasis added)).

### *The Coast Guard Regulations Implementing the Truman-Hobbs Act*

28.    Under the Coast Guard's regulations, a bridge may cause an unreasonable obstruction to navigation in contravention of the Truman-Hobbs Act due to "insufficient height or width of the navigation span" or "difficulty in passing through the draw opening." 33 C.F.R. § 116.01(c).

29.     The Truman-Hobbs Act is enforced by the Commandant and other Coast Guard officers and employees through procedures set forth in Part 116 of the Coast Guard regulations. *See* 33 C.F.R. Part 116.  These procedures are triggered in one of two ways: (a) "[a]ny person, company, or other entity" submits to the Coast Guard "a complaint that a bridge unreasonably obstructs navigation," *id.* §§ 116.05 & 116.10(a), or (b) the District Commander of the Coast Guard district where the bridge is located may decide on his own to initiate a Part 116 proceeding, *id.* § 116.10(b).

30.     If the Part 116 process is triggered, the Coast Guard's regulations require the District Commander to undertake a Preliminary Review to determine whether to conduct a Preliminary Investigation of whether the bridge in question is an unreasonable obstruction to navigation. *See id.* § 116.10.  If a complaint is filed, the District Commander will make this determination through "informal discussions" with the complainant and other parties and a review of certain information pertaining to the bridge in question. *Id.* § 116.10(a)(1) & (2).  If the District Commander starts the Part 116 process on his or her own initiative, the regulations require the District Commander to make this determination "based on a bridge's accident history or other criteria." *Id.* § 116.10(b).

31.     If the District Commander determines that a Preliminary Investigation should be conducted, the regulations require the District Commander to then, as part of the Preliminary Investigation, evaluate the "nature and extent of the obstruction" and to "prepare a written report containing all pertinent information and submit the report, together with a recommendation for or against the necessity of a Detailed Investigation, to the Chief, Office of Bridge Administration [*i.e.* the Chief of the Bridge Administration Division]." *Id.* § 116.15(a) & (b). This "Preliminary Investigation Report" will include, *inter alia,* "a description of the nature and extent of the

obstruction [and] alterations to the bridge believed necessary to meet the reasonable needs of existing and future navigation." *Id.* § 116.15(b).

32.     The Coast Guard's regulations require the Chief to review the Preliminary Investigation Report and "make a Preliminary Decision whether or not to undertake a Detailed Investigation and a Public Hearing." *Id.* § 116.15(c).  If the Chief decides that these next steps should be taken, the regulations require the District Commander to prepare a Detailed Investigation Report, *id.* § 116.20(a), and to hold a public hearing "to address issues bearing on the question of whether the bridge is an unreasonable obstruction to navigation, and, if so, what alterations are needed." *Id.* §§ 116.25(a) & (c).  Upon completing the Detailed Investigation Report, the regulations require the District Commander to submit the report to the Chief, "together with a recommendation of whether the bridge should be declared an unreasonable obstruction to navigation and, if so, whether an Order to Alter should be issued." *Id.* § 116.20(b).

33.     An Order to Alter is an order from the Commandant to the bridge owner "containing the details of the alterations necessary to render navigation through or under the bridge reasonably free, easy, and unobstructed." *Id.* § 116.01(e).  An Order to Alter incorporates such alterations as "structural changes, replacement, or removal of the bridge." *Id.* § 116.01(c).

34.     The Chief, "[u]pon receiving a Detailed Investigation Report[,] . . . will review all the information and make a final determination of whether or not the bridge is an unreasonable obstruction to navigation and, if so, whether to issue an Order to Alter." *Id.* § 116.30(a).  If the Chief determines that an Order to Alter should be issued, the Coast Guard's regulations require the issuance of a letter to the bridge owner, and, at least sixty (60) days after the issuance of this

letter, the Commandant will issue the Order to Alter in accordance with the regulations.  *See id.*

§§ 116.30(e)-(g) & 116.35(a).

## IV.    FACTS

### The Proposed LNG Terminal

35.    Weaver's Cove proposes to construct, own, and operate an LNG import and regasification Terminal to be located on property owned by Weaver's Cove adjacent to the Taunton River in Fall River, Massachusetts.

36.    LNG will be delivered to the Terminal in specialized tankers transiting through the Federal Navigation Channel in Narragansett Bay and Mount Hope Bay, and finally up the existing Federal Navigation Channel in the Taunton River to the Terminal.

### Facts Relating to the Old Bridge

37.    The Old Bridge is a double-leaf bascule bridge crossing the Taunton River between Fall River and Somerset, Massachusetts. It is designated for highway automobile transportation purposes as U.S. Route 6 and Massachusetts Route 138.  It is owned by the Commonwealth of Massachusetts through and by the Massachusetts Highway Department.  *See*, *e.g.*, Coast Guard Office of Bridge Administration, U.S. Coast Guard, Bridge Permit No. 8-97-1 (Dec. 15, 1997) ("Bridge Permit No. 8-97-1") (a true and correct copy of Bridge Permit No. 8-97-1 is attached to this Petition and Complaint and incorporated as Exhibit C); U.S. Coast Guard, *Drawbridge Operation Regulations; Taunton River, Fall River and Somerset, MA*, 73 Fed. Reg. 9190, 9190 (Feb. 20, 2008).

38.    The Taunton River is a navigable water of the United States.

39.    The Old Bridge lies approximately 4,500 feet downstream of the Terminal site and is owned, operated and maintained by agencies of the Commonwealth of Massachusetts.

40.    The Old Bridge is located within the jurisdiction of the First Coast Guard District. *See, e.g.*, 33 C.F.R. § 3.05-1(b).

41.    Any vessel transiting up the Federal Navigation Channel in the Taunton River to points upstream of the Old Bridge, including an LNG vessel delivering LNG to the Terminal site, has no alternative to passing through the Old Bridge.

42.    The placement of the piers supporting the Old Bridge's bascules and drawbridge mechanisms results in only a 98-foot wide drawbridge opening, which physically impedes the transit in the Federal Navigation Channel of the Taunton River of any vessel with a beam in excess of 98 feet.

43.    The Coast Guard has indicated that as a practical matter, only ships with a beam of 80 feet can transit through the Old Bridge with a margin of clearance on either side of the vessel. *See* Letter of Recommendation ("LOR") from Roy A. Nash, Captain, U.S. Coast Guard, Captain of the Port, Southeastern New England, to Gordon Shearer, Chief Executive Officer, Weaver's Cove Energy, LLC, at 26 (Oct. 24, 2007). The LOR is further discussed in paragraphs 72-73, below. See also the May 21, 2008 ruling of the Defendant, District Commander, upholding the LOR on administrative appeal ("May 21 Ruling") discussed below at paragraphs 74-76, below.

44.    This narrow opening interferes with the transit of vessels that historically and currently move under and through the Old Bridge.

45.    The Old Bridge's interference with navigability is exacerbated by the fact that its bascule opening is not centered on the 400 foot wide Federal Navigation Channel, but is offset to the extreme western edge of the channel.  *See* Exhibit A, photographs of the Old Bridge.

**The Coast Guard Has Previously Determined That the Old Bridge Is a Hazard To Navigation and Required Its Removal**

*The Coast Guard Recognized that the Old Bridge Is a Hazard to Navigation as Early as 1988*

46.    The Coast Guard has long acknowledged that the Old Bridge obstructs and unduly interferes with the reasonable needs of navigation.  In a 1988 letter from Gary Kassof, then Supervising Bridge Management Specialist of the First Coast Guard District, to the Massachusetts Department of Public Works, the Coast Guard stated: "The existing 98-foot [horizontal] clearance is known to be *grossly inadequate for existing and potential navigation on the waterway. . . .*"  Letter from Gary Kassof, Supervising Bridge Management Specialist, First Coast Guard District, U.S. Coast Guard, to Robert H. Johnson, Chief Engineer, Massachusetts Department of Public Works (Dec. 19, 1988), at 1 (emphasis added).

*The Coast Guard Required Removal of the Old Bridge in Connection with Construction of the New Brightman Street Bridge Because the Old Bridge Is a Hazard to Navigation*

47.    In the 1980s, in recognition of the navigational and safety concerns associated with the Old Bridge, plans were made by the bridge owner to replace the Old Bridge with the New Brightman Street Bridge to be located immediately upstream of the Old Bridge.  *See, e.g.,* First Coast Guard District, U.S. Coast Guard, *Findings of Fact for the Proposed Replacement of the Brightman Street Bridge Over the Taunton River* (Nov. 3, 1997) ("*Coast Guard Findings of Fact*").  A true and correct copy of the *Coast Guard Findings of Fact* is attached to this Petition and Complaint and incorporated as Exhibit D.  After many years of planning and detailed design

work (spanning well over a decade), actual construction of the New Bridge commenced in early 2001 and remains ongoing. The New Bridge will have a horizontal navigation span of a minimum of 200 feet, compared with the Old Bridge's horizontal navigation span of 98 feet. *See* Exhibit D, *Coast Guard Findings of Fact*, at 2-3.

48.   In 1997, as part of its determination to issue the permit required to construct the New Bridge, the *Coast Guard Findings of Fact* were issued stating that the purpose of the New Bridge project was to "construct [a] new bridge to replace [the] deteriorated, functionally-obsolete bridge," or in other words, the Old Bridge. Exhibit D, *Coast Guard Findings of Fact*, at 3.

49.   The Coast Guard also found that the Old Bridge's "inadequate horizontal clearance, has resulted in substantial monetary losses owing to economies of scale, vessel and bridge damage due to allisions with the bridge, necessity to utilize more tugs, and loss of vessel transit time." *Id.*

50.   The Coast Guard further recognized that there had been "numerous complaints and allisions [that] have occurred at [the old] bridge owing to its minimal horizontal clearance, undesirable siting of channel opening on the wide side of the waterway, and absence of a fender system for several years on the east side of the channel opening." *Id.* at 4, 9-10.

51.   The Coast Guard also found that, although a petroleum marine terminal located upstream of the Old Bridge "recently closed to business," the "possibility exists for the facility to reopen or for another owner to utilize the site for similar type operations." Exhibit D, *Coast Guard Findings of Fact,* at 9. The Coast Guard concluded that "[t]he proposed bridge, having superior clearances, would meet the needs of any such operations." Exhibit D, *Coast Guard*

*Findings of Fact,* at 9.  Weaver's Cove's proposed Terminal is located at the site of the former petroleum marine terminal that was referenced by the Coast Guard.

52.    As a result of these findings, the permit issued by the Coast Guard pursuant to Title V of the General Bridge Act of 1946, as amended, 33 U.S.C. §§ 525-533, approving the location and plans for the New Bridge, required the removal of the Old Bridge by imposing the following condition: "All parts of the existing to be replaced bridge across the Taunton River, mile 1.8, not utilized in the new bridge shall be removed down to or below the natural bottom of the waterway, except that all parts of the bridge 200 feet on either side of the centerline of the channel shall be removed down to or below an elevation of 40 feet below Mean Low Water and the waterway cleared to the satisfaction of the District Commander."  Exhibit C, Bridge Permit No. 8-97-1 (Dec. 5, 1997), at 2.  *See also* Exhibit D, *Coast Guard Findings of Fact*, at 15-16.

53.    This condition required the Old Bridge to be removed within 270 days of the opening of traffic on the New Bridge, due in part to the navigational hazard the Old Bridge poses both by itself and in conjunction with its position and orientation relative to the New Bridge and the Federal Navigation Channel.  Exhibit C, Bridge Permit No. 8-97-1, at 2.

54.    The U.S. Army Corps of Engineers ("Corps") permit for the construction of the New Bridge contained a similar condition regarding removal of the Old Bridge.  The Corps required the removal of the Old Bridge "[i]n order to assure that the Federal navigation project in the Taunton River can be adequately maintained and that the purpose of the project is not compromised."  U.S. Army Corps of Engineers Permit No. 199402067 (May 22, 1998), at 7-8.

55.    In 2001, the owner of the Old Bridge, the Massachusetts Highway Department, denied a request to retain portions of the Old Bridge as a fishing pier.  The Massachusetts

Highway Department characterized the Old Bridge as "structurally deficient, [having] undergone substantial deterioration over its nearly one hundred year life." Letter from Thomas F. Broderick, P.E., Chief Engineer, Massachusetts Highway Department to Ronald R. Lassonde (Apr. 27, 2001).

**Events Subsequent to the Issuance of the Coast Guard Permit for the New Bridge**

*Weaver's Cove Application for a Letter of Recommendation from the Coast Guard*

56.    Pursuant to the Port and Waterways Safety Act, 33 U.S.C. § 1221, *et seq.*, and related regulations, 33 C.F.R. Part 127, on May 12, 2004, Weaver's Cove filed a Letter of Intent ("LOI") with the Coast Guard Captain of the Port, Southeastern New England, seeking an LOR (*see* ¶ 3, *supra*) finding that the waterway, including the Taunton River, is suitable for the transit of LNG tankers to the proposed Terminal site in Fall River, Massachusetts. The LOI contemplated that the Old Bridge would be removed in accordance with the conditions in the Coast Guard and Corps permits for the New Bridge, and thus proposed the use of LNG ships with a typical beam of 145 feet.

*Enactment of SAFETEA-LU Section 1948*

57.    On August 10, 2005, long after the permits for construction of the New Bridge had been issued with the condition that the Old Bridge be removed, and approximately four years after construction of the New Bridge commenced, Congress, at the instigation of an avowed political opponent of Weaver's Cove's proposed LNG facility, enacted legislation (A) prohibiting the use of Federal funds to demolish the Old Bridge and (B) stating that the Old Bridge "be maintained for pedestrian and bicycle access, and as an emergency service route." SAFETEA-LU § 1948 ("Section 1948").

58.     Section 1948 was characterized by its political sponsor as being specifically designed to create a permanent navigational obstacle to standard-size LNG tankers transiting the Taunton River from Narragansett Bay to the Terminal proposed by Weaver's Cove.  *See* George Austin, *Bridge Could Block LNG Tankers from Coming*, Spectator (Somerset, MA), Aug. 10, 2005, at 3 (quoting U.S. Congressman James McGovern); Stephanie Ebbert, *Politics Shape Fall River Project: Bridge Work Goes On and On*, Boston Globe, Aug. 27, 2007, at 1A.   True and correct copies of the Austin and Ebbert articles are attached to this Petition and Complaint and incorporated as Exhibits E and F, respectively.

59.     After the catastrophic bridge collapse in Minnesota that occurred on August 1, 2007, the sponsor of Section 1948, referring to the Old Bridge, stated as follows: "It is, by almost all accounts, not a safe bridge, . . . But people are still traveling on it, largely because it has not been a political priority by the state's leaders. We are very, very lucky that there hasn't been a catastrophe there."  Exhibit F, Ebbert, at 1A (quoting U.S. Congressman James McGovern).

### *Weaver's Cove's Response to the Enactment of Section 1948*

60.     In light of the potential retention of the Old Bridge, on February 2, 2006, Weaver's Cove submitted to the Coast Guard Captain of the Port a change of information in the LOI notifying the Coast Guard that, to deliver LNG to the Terminal, Weaver's Cove would utilize smaller size LNG tankers, with a beam of 82 feet, to fit within the restricted span of the Old Bridge.  In a subsequent informational supplement letter dated February 21, 2007, titled "Additional Smaller LNG Ship Design Navigational and Operational Data," Weaver's Cove proposed a range of ship sizes to be utilized in the transit, the largest of which estimated a beam of 85 feet. The Coast Guard used this largest beam estimate in its analysis in the LOR.  *See* LOR at 21 n.3 (discussed further in paragraphs 72-73 below).

61.    On October 24, 2007, the Captain of the Port issued an LOR that determined that the waterway in question was not suitable for the transit of LNG tankers, notwithstanding the smaller size of the proposed tankers.  In making this determination, the Captain of the Port noted extensively the navigational obstacles caused by the continued presence of the Old Bridge along the waterway.  *See* LOR (discussed further in paragraphs 72-73, below); *see also* Letter from Roy A. Nash, Captain, U.S. Coast Guard, to Gordon Shearer, Chief Executive Officer, Weaver's Cove Energy, LLC, at 1 (May 9, 2007) ("[T]he transit through the new and old Brightman Street Bridges [is] 'an extraordinary navigational maneuver' that [leaves] 'no margin for error.'") Based on this conclusion, the LOR denied transit of the LNG tankers as proposed.

62.    On January 7, 2008, Weaver's Cove appealed the Captain of the Port's LOR to the Defendant, District Commander.  *See* ¶¶ 74-76, *infra.*

**Following the Enactment of Section 1948, the Coast Guard Triggered the Part 116 Procedures Because of the Navigational Problems the Old Bridge Continued to Pose by itself and in Conjunction with the New Bridge**

63.    The navigational problems associated with the Old Bridge — a maximum 98 foot (functionally 85 feet or less) horizontal clearance in a waterway that otherwise provides a 400 foot navigation channel, and a navigation span that is toward the west side of the Federal Navigation Channel — are compounded by retention of the Old Bridge in combination with the location of the New Bridge.  The New Bridge is located less than 1,500 feet upstream of the Old Bridge, and the openings of the two bridges are not aligned.  An aerial photograph of the couplet of the Old and New Bridges is attached to this Petition and Complaint and incorporated as Exhibit G.  The Coast Guard has opined that "[b]ecause the navigation openings do not align, mariners are faced with the additional difficulty of moving obliquely once through the old bridge so as to become aligned for the navigation span on the new bridge." Eighth Coast Guard District

Bridge Branch, Navigation Review: Brightman Street Bridge Across the Taunton River, Mile 1.8 Between Fall River and Somerset, Massachusetts, (May 8, 2007), at 6 ("Navigation Review") (a true and correct copy of the Navigation Review is attached to this Petition and Complaint and incorporated as Exhibit H); *see also* U.S. Coast Guard, Notice of Proposed Rulemaking, *Regulated Navigation Area:  Narragansett Bay, RI and Mount Hope Bay, MA, Including the Providence River and Taunton River,* 71 Fed. Reg. 30108, 30109, 30112 (May 25, 2006) (codifying safety measures designed to mitigate the navigational obstacles presented by the configuration of the two bridges).  The navigation challenges posed by the Old Bridge-New Bridge couplet are described more fully in paragraphs 70 & 73, below. *See also* Exhibit G, a photograph of the couplet created by the Old and New Bridges.

### *The Commandant (G-PWB) Approves the Initiation of a Preliminary Investigation*

64.     By memorandum dated April 3, 2006, Gary Kassof, Bridge Program Manager for the First Coast Guard District, acting in the capacity of the District Commander, requested authority from the Commandant (G-PWB) to investigate the Old Bridge as a "potential obstructive bridge." Memorandum from Gary Kassof, Commander, First Coast Guard District (dpb), to Commandant (G-PWB), Coast Guard Headquarters, Washington, D.C. (Apr. 3, 2006). A true and correct copy of the District Commander's April 3, 2006 memorandum is attached to this Petition and Complaint and incorporated as Exhibit I.

65.     According to the District Commander, "[g]iven the history of allisions and the obstructive nature of the existing Brightman Street Bridge presently and in the future it is recommended that an obstructive bridge analysis be conducted." *Id.* at 3.

66.     On April 6, 2006, the Commandant (G-PWB), acting pursuant to the Truman-Hobbs Act, issued a memorandum titled "Preliminary Investigation of the Brightman Street Bridge Across the Taunton River, Mile 2.1, Between Somerset and Fall River, Massachusetts" authorizing a Preliminary Investigation of the Old Bridge.   The memorandum stated that "[b]ased on analysis of the information forwarded [in the request for investigation], it appears that the subject bridge may constitute an unreasonable obstruction to navigation.  For this reason, you are authorized to proceed with *a preliminary investigation* . . ."  Memorandum from Commandant (G-PWB), U.S. Coast Guard, to Commander, First Coast Guard District (dpb) (Apr. 6, 2006) (emphasis added).   A true and correct copy of the memorandum from the Commandant (G-PWB), dated April 6, 2006, is attached to this Petition and Complaint and incorporated as Exhibit J.

### *The Coast Guard Determined that Weaver's Cove's Comments on Navigation Issues Related to the New and Old Bridges Should be Addressed in the Part 116 Process*

67.     On December 21, 2005, in response to a Coast Guard request for public comments on navigational safety within Narragansett Bay and Mount Hope Bay, Weaver's Cove filed comments with the Coast Guard regarding the unreasonable obstruction to navigation created by the narrow span between the piers supporting the bascules of the Old Bridge, the alignment of the bascules on the western edge of the Federal Navigation Channel, the close proximity of the Old and New Bridges, and the misalignment of the bascule openings of the two bridges.

68.     On December 22, 2005, NRG Energy, Inc. ("NRG"), owner of a coal-fired power plant in Somerset, Massachusetts across the river from Weaver's Cove's proposed Terminal, also

filed comments. NRG receives coal shipments by barges and ocean-going bulk carriers which must also pass through both bridges.

69.     In a Notice of Proposed Rulemaking ("NPRM") published May 25, 2006 with respect to the regulated navigation area of Narragansett Bay and Mount Hope Bay, the Coast Guard stated that Weaver's Cove's and NRG's comments were "more aptly addressed via the mechanisms contemplated by 33 C.F.R. part 116, 'Alterations of Unreasonably Obstructive Bridges.'"  U.S. Coast Guard, Notice of Proposed Rulemaking, *Regulated Navigation Area: Narragansett Bay, RI and Mount Hope Bay, MA, Including the Providence River and Taunton River*, 71 Fed. Reg. 30108, 30109 (May 25, 2006).  The NPRM acknowledged that the Commander, First Coast Guard District (dpb) had already "forwarded a letter on April 3, 2006, to Commandant (G-PWB), Coast Guard Headquarters, Washington, DC, to begin the 33 C.F.R. Part 116 process regarding the Old Brightman Street Bridge." *Id.*

### The Coast Guard Found that the Old Bridge Itself and in Combination with the New Bridge Adversely Impacts Navigation

70.     On May 8, 2007, subsequent to the issuance of the memorandum from the Commandant (G-PWB) authorizing a Preliminary Investigation, the Coast Guard issued what it styled as a "Navigation Review."  The Navigation Review concluded:

  a.  "There are three contributing factors that make the Brightman Street Bridge difficult to navigate.  The first is a navigation span that provides 98 feet of horizontal clearance.  Another factor is the location of the navigation opening along the right descending side of the channel which prevents vessels from transiting down the center of the channel.  Cross winds are the third factor that makes transiting the bridge difficult." Exhibit H, Navigation Review, at 4.

  b.  "The adverse impacts to navigation caused by a 98 foot navigation span not aligned with the navigation channel were exacerbated by locating another bridge 1,500 feet upstream.  The new bridge was designed to

improve navigation as well as land traffic by aligning the navigation span with the channel and increasing the horizontal clearance to be more consistent with the channel. Retaining the old Brightman Street Bridge not only nullifies the navigation improvements intended with the new bridge but makes navigation *more difficult*." *Id.* at 7 (emphasis added).

c.     "When the permit for the new bridge was issued, commercial waterway users understood that the off-set of the navigation spans would significantly add to the difficult bridge transit. The hardship caused by the off-set bridge spans would be tolerated during construction with the expectation that the waterway would be much improved when the old Brightman Street Bridge was removed. The new bridge would not have been permitted as it was with a realization the old bridge was going to be retained." *Id.* at 6.

d.     "The Brightman Street Bridge has been allided with numerous times and the bridge owner reports damage repair costs have totaled about $30,000,000 over the life of the bridge." *Id.* at 7.

71.     The Navigation Review does not identify the statutory or regulatory authority pursuant to which it was conducted by the Coast Guard.

**The Coast Guard Reaffirmed That The Old Bridge Poses A Hazard To Navigation In The Letter Of Recommendation Issued To Weaver's Cove**

72.     On October 24, 2007, the Captain of the Port issued an LOR (*see* ¶ 3, *supra*) in response to Weaver's Cove's May 12, 2004 LOI, as amended by the February 2, 2006 change of information letter. The LOR relied on a finding of adverse navigability related to the Old Bridge to justify its conclusions. *See* Letter of Recommendation from Roy A. Nash, Captain, U.S. Coast Guard, Captain of the Port, Southeastern New England, to Gordon Shearer, Chief Executive Officer, Weaver's Cove Energy, LLC (Oct. 24, 2007). A true and correct copy of the LOR is attached to this Petition and Complaint and incorporated as Exhibit K.

73.     The LOR describes in detail how the couplet of the Old Bridge and New Bridge
"makes safe navigation highly challenging." LOR, at 24. The LOR further states:

> The configuration of the two Brightman Street bridges, as they relate to
> each other and the navigation channel, results in a compound navigational
> challenge when considering the proposed tanker's length, breadth, and
> draft dimensions, the number of assist tugs, and the application and
> coordination of security forces. The proximity and arrangement of the old
> and new Brightman Street Bridges to each other presents an elevated risk
> of the proposed vessel striking either or both bridges . . . Specifically, not
> only is the old 98-foot wide bridge narrow relative to the 85-foot wide
> tankers proposed, but a transiting vessel through the first bascule opening
> must stop forward momentum to avoid striking the second bridge in a very
> short distance (less that ¼ ship length). Once stopped, the vessel must be
> moved sideways approximately one hundred feet with tugs and/or bow
> and stern thrusters, to become aligned in the channel for passage through
> the opening of the new bridge. Once aligned with the new bridge opening,
> the vessel must transit through.

*Id.* at 23-24.

74.     On January 7, 2008, subsequent to the Captain of the Port's denial of rehearing of
the LOR, Weaver's Cove submitted an appeal of the decision to the District Commander,
Defendant Rear Admiral Sullivan, pursuant to 33 C.F.R. § 127.015(b)(1).

75.     On May 21, 2008, Rear Admiral Sullivan, issued a decision pursuant to 33 C.F.R.
§ 127.015(c), denying in part Weaver's Cove's appeal of the LOR ("May 21 Ruling"). In that
decision, he reaffirmed the finding in the LOR concerning the hazard to navigation posed by the
couplet of the New and Old Bridges. He also affirmed the finding in the LOR that the continued
existence of the Old Bridge precludes transit of the LNG tankers as proposed.

76.     In the May 21 Ruling, the District Commander reemphasized the pivotal role the
obstruction to navigation caused by the Old Bridge played in the Captain of the Port's
determination in the LOR, stating that the Captain of the Port "repeatedly made clear his
concerns with the navigational safety hazards presented by, among other things, the retention of

the old Brightman Street bridge." May 21 Ruling at 20. The District Commander also addressed the conclusions of the Navigation Review (*see* ¶ 70, *supra*), stating his opinion that it was "[n]ot surprising[]" that the Navigation Review concluded that retaining the Old Bridge makes navigation along the Taunton River more difficult, nullifies any navigational benefit derived from the construction of the New Bridge, and that "[m]aximum waterway improvements will only be possible with removal of the old Brightman Street Bridge." May 21 Ruling at 6 (quoting Navigation Review at 7). Although denying Weaver's Cove's appeal of the LOR, the May 21 Ruling concludes by stating that "should the status of the Brightman Street bridge change, the suitability of the federal channel leading thereto should be re-evaluated, from both navigational safety and security perspectives." May 21 Ruling at 50.

**The Coast Guard Has Not Followed Its Part 116 Process Or Enforced the New Bridge Permit Condition**

77.     Despite: (a) the April 3, 2006 request by the First District Commander to undertake a Preliminary Investigation of the unreasonably obstructive nature of the Old Bridge; (b) the April 6, 2006 authorization from the Commandant (G-PWB) to the First District Commander to undertake a Preliminary Investigation of the unreasonably obstructive nature of the Old Bridge; and (c) the acknowledgement by the Coast Guard in the NPRM that a Preliminary Investigation was being undertaken under Part 116 of the Coast Guard's regulations, no Preliminary Investigation Report has been issued by the Coast Guard.

78.     Given that the Commandant (G-PWB) authorized a Preliminary Investigation before the Navigation Review was issued and the NPRM indicated there would be a Part 116 investigation, Weaver's Cove understood that the document, titled "Navigation Review," would constitute the Preliminary Investigation Report authorized by the Chief. In all substantive respects, the Navigation Review is equivalent to a Preliminary Investigation Report as it is

consistent with the regulatory requirements for a Preliminary Investigation Report, *see* 33 C.F.R. § 116.15(b). For example, the Navigation Review provides a history of the Old Bridge, descriptions of the waterway and waterway traffic (including commercial navigation), and an analysis of the obstruction to navigation posed by the Old Bridge alone and in combination with the New Bridge (*e.g.* the close proximity and misalignment of the openings of the two bridges).

79.     Based on the Navigation Review and the findings therein, Weaver's Cove filed a request on August 17, 2007 with the Bridge Administration Division requesting that the Coast Guard proceed to the next required step of the Part 116 process for reviewing an unreasonable obstruction to navigation, by undertaking a Detailed Investigation of the Old Bridge as contemplated by 33 C.F.R. § 116.20.

80.     On October 4, 2007, the Chief, on behalf of the Commandant, issued a response to Weaver's Cove's request, stating:

> The Navigation Review is not and was never intended to be a Truman-Hobbs Preliminary Investigation. This review was for informational purposes only and was conducted using the methodology provided in the Bridge Administration Manual for Truman-Hobbs investigations. The Coast Guard stated the scope and intent of the Navigation Review twice, once at the meeting held at the NRG Somerset Power plant (attended by Weaver's Cove Energy, LLC) on August 16, 2006 and again in the Navigation Review itself. The Coast Guard believes that initiating a Preliminary Investigation pursuant to a Truman-Hobbs alteration would be redundant and a strain on already stretched resources.

Exhibit B, October 4 Letter, at 1.

81.     The October 4 Letter alleged that the Coast Guard had not conducted a Preliminary Investigation, but went on to state that conducting a Preliminary Investigation would be *redundant* because of the Navigation Review.

82.      The October 4 Letter also explained that the May 8, 2007 Navigation Review (*see*

¶ 70, *supra*) "was conducted using the methodology . . . *for Truman-Hobbs investigations*."

Exhibit B, October 4 Letter, at 1 (emphasis added).

83.      The October 4 Letter concluded that the Old Bridge *twice* has been determined to

be a hazard to navigation by the Coast Guard and that "[s]hould Public Law 109-59 be rescinded,

the Coast Guard would move immediately to enforce the permit condition requiring the

Commonwealth of Massachusetts to remove the old Brightman Street Bridge." *Id.* at 2.

84.      In sum, despite the admissions of the Coast Guard that the Old Bridge poses a

navigational hazard, the October 4 Letter indicates that the Coast Guard will not comply with its

Part 116 procedures by either conducting a Preliminary Investigation or a Detailed Investigation.

85.      Moreover, by amendment to the permit of the New Bridge, on August 23, 2006

the Coast Guard revised its directive for the removal of the Old Bridge to provide that "[s]uch

removal and clearance shall be accomplished as prescribed by the District Commander at any

time there is no Federal law prohibiting the removal of the bridge."    Office of Bridge

Administration, U.S. Coast Guard, Bridge Permit Amendment No. 8a-97-1 (Aug. 23, 2006).  A

true and correct copy of the Aug. 23, 2006 Bridge Permit Amendment is attached to this Petition

and Complaint and incorporated as Exhibit L.

86.      In response to the October 4 Letter, Weaver's Cove sent a letter to the Chief on

October 23, 2007, which pointed out the inconsistent position of the Coast Guard, and again

requested that the Coast Guard conduct a Preliminary or Detailed Investigation as required by

Part 116 of the Coast Guard's regulations.    *See* Letter from Bruce F. Kiely, Attorney for

Weaver's Cove Energy, LLC, to Hala Elgaaly, P.E., Chief, Office of Bridge Administration,

U.S. Coast Guard (Oct. 23, 2007) ("October 23 Letter"). To date, Weaver's Cove has not received a response from the Coast Guard to the October 23 Letter.

87.    To date, the Defendants have not conducted the hearing required by Section 3 of the Truman-Hobbs Act, 33 U.S.C. § 513, and Part 116 of the Coast Guard's regulations, 33 C.F.R. § 116.01(d). Neither have the Defendants completed all of the reports mandated in Part 116 of the Coast Guard's regulations.

88.    The stated basis for the Defendants' refusal to take further action under the Truman-Hobbs Act and the Part 116 regulations is that Section 1948 "prohibit[ed] the expenditure of federal funds for the removal of the [Old Bridge] and required [the bridge owner, the Massachusetts Highway Department] to continue to use the bridge as a pedestrian and bicycle bridge." Exhibit D, *Coast Guard Findings of Fact*, at 1; *see also* Exhibit B, October 4 Letter, at 2 ("Should [Section 1948] be rescinded, the Coast Guard would move immediately to enforce the permit condition requiring the Commonwealth of Massachusetts to remove the old Brightman Street Bridge.").

89.    As enacted, nothing in Section 1948 excuses the Defendants from carrying out their legal duties imposed upon them by the Truman-Hobbs Act and the Part 116 regulations.

## COUNT I
### (Failure to Perform Duty Pursuant to the Truman-Hobbs Act)

90.    Plaintiff realleges and incorporates by reference the allegations in the paragraphs above.

91.    Weaver's Cove petitions this Court to issue a writ of mandamus to the Defendant Commandant, commanding and directing him to carry out his statutory duty, set forth in Section

3 of the Truman-Hobbs Act, to hold a public hearing at which interested parties "shall have full opportunity to offer evidence and be heard as to whether any alteration of [the Old Bridge] is needed, and if so what alterations are needed." *See* 33 U.S.C. § 513.

92.    To date, Defendant Commandant has not carried out this statutory duty required by Section 3 of the Truman-Hobbs Act, 33 U.S.C. § 513, and Defendant Chief, acting by direction of the Commandant, has indicated that the Coast Guard will take no further action pursuant to the Truman-Hobbs Act and related regulations regarding the Old Bridge. *See* Exhibit B, October 4 Letter, at 1-2.

93.    Issuance of the writ of mandamus petitioned for by Weaver's Cove in this count is appropriate because Section 3 of the Truman-Hobbs Act imposes an affirmative statutory duty on Defendant Commandant to hold a public hearing on the navigational hazards posed by the Old Bridge:

> Whenever any bridge shall, in the opinion of the [Commandant], at any time unreasonably obstruct such navigation, it shall be the duty of the [Commandant], after notice to interested parties, to hold a hearing at which the bridge owner, those interested in water navigation thereunder or therethrough, those interested in either railroad or highway traffic thereover, and any other party or parties in interest shall have full opportunity to offer evidence and be heard as to whether any alteration of such bridge is needed, and if so what alterations are needed, having due regard to the necessity of free and unobstructed water navigation and to the necessities of the rail or highway traffic.

33 U.S.C. § 513.

94.    The Commandant has already formed an opinion, as contemplated by Section 3 of the Truman-Hobbs Act, that the Old Bridge unreasonably obstructs navigation. For example, the Chief, acting by direction of the Commandant, stated in the October 4 Letter that "[t]he Coast Guard . . . has *twice* determined that the old Brightman Street Bridge and the new replacement

bridge, in combination, are a hazard to navigation." Exhibit B, October 4 Letter, at 2 (emphasis added). The Chief, acting by direction of the Commandant, also has opined that "it appears that the [Old Bridge] may constitute an unreasonable obstruction to navigation." Memorandum from Commandant (G-PWB), U.S. Coast Guard, to Commander, First Coast Guard District (dpb) (Apr. 6, 2006).

95.    Other actions of the Coast Guard also indicate that the Commandant has formed the opinion referred to in Section 3 of the Truman-Hobbs Act that the Old Bridge unreasonably obstructs navigation, such that the statutory duty to hold a public hearing has been triggered. These actions, include, but are not limited to: (a) the December 19, 1988 letter from the First Coast Guard District to the Massachusetts Department of Public Works (see ¶ 46, supra); (b) the Coast Guard Findings of Fact issued as part of the determination to issue the navigability permit for the construction of the New Bridge (see ¶¶ 47-51, supra); (c) the April 3, 2006 memorandum from the First District Commander to the Commandant (G-PWB) (see ¶ 64-65, supra); (d) the April 6, 2006 authorization from the Commandant (G-PWB) to the First District Commander to conduct a Preliminary Investigation (see ¶ 66, supra); (e) the May 8, 2007 Navigation Review (see ¶ 70, supra); (f) the October 4, 2007 response of the Chief to Weaver's Cove's request for a Detailed Investigation (see ¶¶ 80-84, supra); and (g) the October 24, 2007 Letter of Recommendation on Weaver's Cove's LNG vessel transit plan (see ¶¶ 72-73, supra).

96.    Because the Commandant already stated his opinion that the Old Bridge "unreasonably obstruct[s] the free navigation of" the Taunton River, he is required as a matter of law to conduct the public hearing required by Section 3 of the Truman-Hobbs Act, 33 U.S.C. § 513. 84. This duty to hold a public hearing with respect to the Old Bridge is "ministerial,

plainly defined, and peremptory," *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 366 F. Supp. at 57.

97.     The Commandant's duty to hold a Truman-Hobbs Act hearing regarding the Old Bridge is owed to the Plaintiff, as the Plaintiff is directly and concretely interested in free, easy and unobstructed navigation under and through the Old Bridge, and is a party within the zone of interest of the Truman-Hobbs Act.

98.     The Commandant's refusal to hold a public hearing pursuant to the Truman-Hobbs Act is contrary to the duty imposed upon the Commandant and owed to Plaintiff.

99.     Plaintiff has neither an adequate administrative remedy, nor an adequate remedy at law.

100.     The Commandant's refusal to act pursuant to Section 3 of the Truman-Hobbs Act, 33 U.S.C. § 513, has caused and will continue to cause Plaintiff unusual hardship and irreparable injury, in that the Old Bridge remains an unreasonable obstruction to the free, easy and unobstructed navigation of the Taunton River, and as a result Plaintiff is denied the right to have "full opportunity to offer evidence and be heard," 33 U.S.C. § 513, on the navigability issues related to the Old Bridge.

## COUNT II
**(Failure to Perform Duty Pursuant to the Coast Guard Regulations Interpreting the Truman-Hobbs Act)**

101.     Plaintiff realleges and incorporates by reference the allegations in the paragraphs above.

102.    Weaver's Cove petitions this Court to issue a writ of mandamus to the Commandant commanding and directing him to carry out the duty imposed upon him under the Coast Guard's own regulations. These regulations state that the duty of the Commandant under the Truman-Hobbs Act, as the head of the Coast Guard, is to hold a public hearing at which interested parties "shall have a full opportunity to be heard and to offer evidence on the question of whether alterations to the [Old Bridge] are necessary and, if so, the extent of alterations needed." 33 C.F.R. § 116.01(d) (stating "Whenever the Coast Guard has good reason to believe that a bridge across any of the navigable waters of the United States is an unreasonable obstruction to navigation, the Coast Guard *will . . . hold* a public hearing" (emphasis added)).

103.    To date, the Commandant has not carried out the duty imposed upon him by Part 116 of the Coast Guard's regulations, and the Chief, acting by direction of the Commandant, has indicated that the Coast Guard will take no further action pursuant to the Truman-Hobbs Act and related regulations regarding the Old Bridge. *See* Exhibit B, October 4 Letter, at 1-2.

104.    Issuance of the writ of mandamus petitioned for by Weaver's Cove in this count is appropriate because Part 116 of the Coast Guard's regulations interpreting Section 3 of the Truman-Hobbs Act imposes an affirmative legal duty on the Commandant to hold a public hearing on the navigation hazards posed by the Old Bridge. That duty is "ministerial, plainly defined, and peremptory," *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 366 F. Supp. at 57, because it is clearly established that Defendants (or their predecessors) have found on many occasions good reason to believe that the Old Bridge unreasonably obstructs navigation. For example, the Chief stated in the October 4 Letter that "[t]he Coast Guard . . . has *twice* determined that the old Brightman Street Bridge and the new replacement bridge, in combination, are a hazard to navigation." Exhibit B, October 4 Letter, at 2 (emphasis added).

The Chief, acting by direction of the Commandant, also has concluded that "it appears that the [Old Bridge] may constitute an unreasonable obstruction to navigation." Memorandum from Commandant (G-PWB), U.S. Coast Guard, to Commander, First Coast Guard District (dpb) (Apr. 6, 2006). Under the Coast Guard's regulations, such "good reason to believe that [the Old Bridge] is an unreasonable obstruction to navigation," is sufficient to trigger the duty to hold a public hearing set forth in Section 3 of the Truman-Hobbs Act. *See* 33 C.F.R. § 116.01(d).

105.    That conclusion is supported by the full complement of Coast Guard findings made regarding the Old Bridge, including, but not limited to: (a) the December 19, 1988 letter from the First Coast Guard District to the Massachusetts Department of Public Works (*see* ¶ 46, *supra*); (b) the *Coast Guard Findings of Fact* issued as part of the determination to issue the navigability permit for the construction of the New Bridge (*see* ¶¶ 47-51, *supra*); (c) the April 3, 2006 memorandum from the First District Commander to the Commandant (G-PWB) (*see* ¶ 64-65, *supra*); (d) the April 6, 2006 authorization from the Commandant (G-PWB) to the First District Commander to conduct a Preliminary Investigation (*see* ¶ 66, *supra*); (e) the May 8, 2007 Navigation Review (*see* ¶ 70, *supra*); (f) the October 4, 2007 response of the Chief to Weaver's Cove's request for a Detailed Investigation (*see* ¶¶ 80-84, *supra*); and (g) the October 24, 2007 Letter of Recommendation on Weaver's Cove's LNG vessel transit plan (*see* ¶¶ 72-73, *supra*). Because of their own prior findings, Defendants have "good reason to believe that [the Old Bridge] is an unreasonable obstruction to navigation," 33 C.F.R. § 116.01(d), and therefore as a matter of law are required to conduct the public hearing required by the Truman-Hobbs Act.

106.    The Commandant's duty to hold a Truman-Hobbs hearing regarding the Old Bridge is owed to the Plaintiff, as the Plaintiff has a direct and concrete interest in free, easy and

unobstructed navigation under and through the Old Bridge, and is a party within the zone of interest of the Truman-Hobbs Act.

107.    The Commandant's refusal to hold a public hearing pursuant to the Truman-Hobbs Act is contrary to the duty imposed upon the Commandant and owed to Plaintiff.

108.    Plaintiff has neither an adequate administrative remedy, nor an adequate remedy at law.

109.    The Commandant's refusal to act pursuant to Section 3 of the Truman-Hobbs Act, 33 U.S.C. § 513, has caused and will continue to cause Plaintiff unusual hardship and irreparable injury, in that the Old Bridge remains an unreasonable obstruction to the free, easy and unobstructed navigation of the Taunton River, and as a result Plaintiff is denied the right to have "a full opportunity to be heard and to offer evidence," 33 C.F.R. § 116.01(d), on the navigability issues related to the Old Bridge.

**COUNT III**
**(Failure to Perform Duties Pursuant to Part 116 of Title 33 of the Code of Federal Regulations)**

110.    Plaintiff realleges and incorporates by reference the allegations in the paragraphs above.

111.    Weaver's Cove petitions this Court to issue a writ of mandamus to each Defendant commanding and directing each to follow the procedures set forth in Part 116 of the regulations promulgated pursuant to the Truman-Hobbs Act to determine if the Old Bridge is an unreasonable obstruction to navigation, and if so, what alterations should be required to assure free, easy and unobstructed navigation in the Taunton River.   *See* 33 C.F.R. Part 116.

Specifically, Weaver's Cove petitions this Court to direct and command the Chief and the First District Commander to undertake a Detailed Investigation of the Old Bridge, *see* 33 C.F.R. § 116.20, or, in the alternative, to prepare and issue a Preliminary Investigation Report, together with the recommendation whether to conduct a Detailed Investigation, and render a Preliminary Decision, as required by 33 C.F.R. § 116.15.

112.    Issuance of the writ of mandamus directing and commanding Defendants to undertake a Detailed Investigation is appropriate because Section 2 of the Truman-Hobbs Act imposes a statutory duty on the Commandant to insure that "[n]o bridge shall at any time unreasonably obstruct the free navigation" of the Taunton River. 33 U.S.C. § 512. In the course of carrying out this duty, the Coast Guard regulations require that a Detailed Investigation be carried out by the Chief and the First District Commander when the Chief determines, based upon a Preliminary Investigation, that such Detailed Investigation is warranted. *See* 33 C.F.R. § 116.15(d). Upon such a finding, the duty to conduct a Detailed Investigation is "ministerial, plainly defined, and peremptory," *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 366 F. Supp. at 57.

113.    To date, the Chief and the First District Commander have failed to undertake a Detailed Investigation of the Old Bridge, even though the Chief *de facto* has made the determination that a Detailed Investigation is warranted. *See* Exhibit B, October 4 Letter; ¶¶ 80-84, *supra*.

114.    On April 6, 2006, the Commandant (G-PWB) authorized the First District Commander to conduct a Preliminary Investigation (*see* ¶ 66, *supra*). On May 8, 2007, a "Navigation Review" was conducted (*see* ¶ 70, *supra*), which in substance amounts to a

Preliminary Investigation Report given the substantial support offered by: (a) the substance of the Navigation Review; (b) the statement of the Chief that "initiating a Preliminary Investigation . . . would be *redundant*," Exhibit B, October 4 Letter, at 1 (emphasis added); and (c) the fact that the Navigation Review was conducted using the Truman-Hobbs investigation methodology. *See* Exhibit B, October 4 Letter.

115.    The Chief, acting by direction of the Commandant, also states in that October 4 Letter that "[t]he Coast Guard . . . has *twice* determined that the old Brightman Street Bridge and the replacement bridge, in combination, are a hazard to navigation." *Id.* at 2.

116.    Together, the Coast Guard's prior statements and actions, including those of the Chief, acting by direction of the Commandant, demonstrably lead to the conclusion that the Coast Guard's evaluation of the Old Bridge, in sum and substance, is beyond the preliminary stage and that a Detailed Investigation should be initiated.

117.    Alternatively, if the Defendants are not ordered to conduct a Detailed Investigation, Weaver's Cove petitions this Court to issue a writ of mandamus to Defendants, directing and commanding the Chief and the First District Commander to prepare and issue a Preliminary Investigation Report, together with the recommendation whether to conduct a Detailed Investigation, and render a Preliminary Decision, as required by 33 C.F.R. § 116.15.

118.    Issuance of the writ of mandamus sought in paragraph 117, above, is appropriate because the Coast Guard regulations require that, once a decision has been made to conduct a Preliminary Investigation, the District Commander "will prepare a [Preliminary Investigation Report] and submit the report, together with a recommendation for or against the necessity of a Detailed Investigation, to the Chief." 33 C.F.R. § 116.15. These duties are "ministerial, plainly

defined, and peremptory," *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 366 F. Supp. at 57.

119.    Although the Chief, on behalf of the Commandant, alleged in the October 4 Letter that a Preliminary Investigation had not been initiated, that assertion is inconsistent with the Chief's own admission that conducting such an investigation would be redundant and that the May 8, 2007 Navigation Review was carried out in accordance with the Coast Guard's methodology for Truman-Hobbs investigations. The May 25, 2006 NPRM also indicates that the Coast Guard was initiating a Part 116 investigation of the Old Bridge. Yet, the Chief has indicated that the Coast Guard will take no further action regarding the Old Bridge, pursuant to the Truman-Hobbs Act and related regulations. *See* Exhibit B, October 4 Letter, at 1-2.

120.    Once the decision was made by the Commandant (G-PWB) on April 6, 2007 that a Preliminary Investigation should be conducted, the District Commander became obligated by Section 116.15 of the Coast Guard's regulations to prepare a Preliminary Investigation Report, and the Chief became obligated to issue a Preliminary Decision. *See* 33 C.F.R. § 116.15. Therefore, Defendants are required as a matter of compliance with Coast Guard regulations, having the force of law, to carry out these duties.

121.    The duties imposed upon Defendants with respect to undertaking a Detailed Investigation and issuing a Preliminary Investigation Report and Preliminary Decision pursuant to Part 116 of the Coast Guard's regulations are owed to the Plaintiff, as the Plaintiff is directly and concretely interested in ship navigation under and through the Old Bridge, and is a party within the zone of interest of the Truman-Hobbs Act.

122.    The Defendants' refusal to either conduct a Detailed Investigation, or prepare a Preliminary Investigation Report and issue a Preliminary Decision, is contrary to the duty that is imposed upon the Defendants and is owed to Plaintiff.

123.    Plaintiff has neither an adequate administrative remedy, nor an adequate remedy at law.

124.    Defendants' refusal to act pursuant to the Truman-Hobbs Act and the related Coast Guard regulations has caused and will continue to cause Plaintiff unusual hardship and irreparable injury, in that the Old Bridge remains an unreasonable obstruction to the free, easy and unobstructed navigation of the Taunton River.

## COUNT IV
## Declaratory Relief

125.    Plaintiff realleges and incorporates by reference the allegations in the paragraphs above.

126.    Weaver's Cove prays this Court declare that Section 1948 of SAFETEA-LU does not excuse or otherwise prevent Defendants from fulfilling their statutory responsibility under the Truman-Hobbs Act and related Coast Guard regulations with respect to the Old Bridge. Specifically, Weaver's Cove prays this Court declare that Section 1948 does not excuse or otherwise prevent the Coast Guard from holding the public hearing required by Section 3 of the Truman-Hobbs Act, or following its Part 116 process with respect to the Old Bridge.

127.    In the October 4 Letter, the Chief, on behalf of the Commandant, stated that "[s]hould Public Law 109-59 [(Section 1948 of SAFETEA-LU)] be rescinded, the Coast Guard

would move immediately to enforce the permit condition requiring the Commonwealth of Massachusetts to remove the old Brightman Street Bridge." Exhibit B, October 4 Letter, at 2.

128.    The Coast Guard's response constitutes an admission by the Coast Guard that it does not intend to comply with its mandate under the Truman-Hobbs Act to remedy, through the Part 116 process, the unreasonable obstruction to navigation posed by the Old Bridge.

129.    Nothing in Section 1948 excuses or otherwise prevents Defendants from: complying with the law and holding a public hearing pursuant to Section 3 of the Truman-Hobbs Act, 33 U.S.C. § 513; following the Preliminary Investigation and Detailed Investigation procedures set forth in the Coast Guard's regulations, 33 C.F.R. §§ 116.15 & 116.20; or ordering alteration of the Old Bridge by mandating "structural changes, replacement, or removal of the bridge," 33 C.F.R. § 116.01(c), in exercise of their Truman-Hobbs Act duty.

130.    For the reasons set forth in paragraph 129, above, Section 1948 does not relieve Defendants of their respective duties mandated by the Truman-Hobbs Act and related Coast Guard regulations to insure that "[n]o bridge shall at any time unreasonably obstruct the free navigation" of the Taunton River, 33 U.S.C. § 512, specifically the duty to hold a public hearing, 33 U.S.C. § 513, and of the duty to follow the Preliminary and Detailed Investigation procedures set forth in the Coast Guard's regulations, 33 C.F.R. §§ 116.15 & 116.20, with respect to the Old Bridge.  Weaver's Cove requests that this Court declare that to be so.

131.    Such declaratory relief is necessary to require Defendants to carry out their duties owed under the Truman-Hobbs Act and related Coast Guard regulations to Plaintiff, who is directly and concretely interested in free, safe and unobstructed navigation under and through the Old Bridge, and who is within the zone of interest of the Truman-Hobbs Act.

132.    Relief under the Declaratory Judgment Act is warranted in this case, because such relief would promote the Act's "laudable policy of providing speedy adjudication of legal disputes to remove uncertainty and insecurity from legal relationships." *Wilderness Soc'y v Morton*, 479 F.2d 842, 887 (D.C. Cir. 1973).

133.    Declaratory relief is proper in this case because "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

## V.    PRAYER FOR RELIEF

WHEREFORE Weaver's Cove asks this Court to:

(A)    Declare that the Commandant's failure to hold a public hearing regarding the Old Bridge pursuant to the Truman-Hobbs Act is contrary to the statutory duty the Commandant owes to the Plaintiff and order him to hold such a public hearing;

(B)    Declare that the Commandant's failure to hold a public hearing regarding the Old Bridge pursuant to the Coast Guard's regulations interpreting the Truman-Hobbs Act is contrary to the statutory duty the Commandant owes to the Plaintiff, and order him to hold such a public hearing;

(C)    Declare that failure and refusal of the Chief and the First District Commander to conduct a Detailed Investigation of the Old Bridge, or alternatively, to issue a Preliminary Investigation Report on the Old Bridge and render a Preliminary Determination, is contrary to

the duty the Chief and the First District Commander owe to the Plaintiff under Part 116 of the Coast Guard's regulations, and order them to comply with the applicable Part 116 procedures;

(D)    Declare that Section 1948 does not prohibit the Coast Guard from complying with the mandate of the Truman-Hobbs Act to hold a public hearing on the Old Bridge, or from complying with the Part 116 process with respect to the Old Bridge, including alteration of the Old Bridge;

(E)    Award Weaver's Cove its costs, reasonable attorneys' fees, and other disbursements; and

(F)    Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Bruce F. Kiely (DC Bar No. 276024)
Jessica A. Fore (DC Bar No. 493712)
Jeffrey M. Bauer (DC Bar No. 494284)
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC  20004-2400
Telephone:  (202) 639-7700
Fax:  (202) 585-1035
E-mail:  bruce.kiely@bakerbotts.com

*Counsel for Weaver's Cove Energy, LLC*

Dated: June 10, 2008

# Exhibit A

**Old Brightman Street Bridge (Closed Position)**



**Old Brightman Street Bridge (Open Position)**



# Exhibit B

**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: CG-54111
Phone: (202) 372-1511
Fax: (202) 372-1914

16592
October 4 , 2007

Mr. Ted Gehrig
President
Weaver's Cove Energy, LLC
One New Street
Fall River, MA  02720

Dear Mr. Gehrig:

This is in reply to Baker Botts, LLP letter of August 17, 2007, sent on your behalf, Request for the Initiation of a Detailed Investigation under 33 C.F.R. § 116.20.  In order to ensure that the Coast Guard's position concerning the necessity of conducting an investigation under the Truman-Hobbs Act is completely clear, we would like to make the following points:

1.  Before issuing permit 8-97-1, dated December 5, 1997, the Coast Guard determined that the old Brightman Street Bridge and the new replacement bridge, in combination, would create a hazard to navigation.  To remove this hazard, the Coast Guard included a condition in the permit that required the Massachusetts Highway Department (MHD) to remove the existing bridge to or below the natural bottom within 270 days of completion of the new bridge.  Public Law 109-59, dated August 10, 2005, superseded this permit condition by requiring that the old Brightman Street Bridge be retained for pedestrian and bicycle access, and as an emergency service route.

2.  The Coast Guard confirmed the permit determination with the May 8, 2007 Navigation Review.  This review concludes that retaining the old Brightman Street Bridge not only nullifies the navigation improvements intended with the new bridge, but actually makes navigation more difficult.  Maximum intended waterway improvement will only be possible with removal of the old Brightman Street Bridge.

3.  The Navigation Review is not and was never intended to be a Truman-Hobbs Preliminary Investigation.  This review was for informational purposes only and was conducted using the methodology provided in the Bridge Administration Manual for Truman-Hobbs investigations. The Coast Guard stated the scope and intent of the Navigation Review twice, once at the meeting held at the NRG Somerset Power plant (attended by Weaver's Cove Energy, LLC) on August 16, 2006 and again in the Navigation Review itself.  The Coast Guard believes that initiating a Preliminary Investigation pursuant to a Truman-Hobbs alteration would be redundant and a strain on already stretched resources.

The Coast Guard takes the responsibility to keep navigation through or under bridges free, easy, and unobstructed very seriously and has twice determined that the old Brightman Street Bridge and the new replacement bridge, in combination, are a hazard to navigation.  Should Public Law 109-59 be rescinded, the Coast Guard would move immediately to enforce the permit condition requiring the Commonwealth of Massachusetts to remove the old Brightman Street Bridge.

Sincerely,

Hala Elgaaly, P.E.
Chief, Bridge Administration Division
U. S. Coast Guard
By direction of the Commandant

Copy: Bruce F. Kiely, Baker Botts, LLP
      Jessica Fore, Baker Botts, LLP

2

# Exhibit C

FROM : U.S. COAST GUARD BRIDGE ADMIN.   PHONE NO. : 212 668 7967          Dec. 15 1997 10:08AM P2

DEC   5 1997

### (8-97-1)

**WHEREAS** by Title V of an act of Congress approved August 2, 1946, entitled "General Bridge Act of 1946," as amended (33 U.S.C. 525-533), the consent of Congress was granted for the construction, maintenance and operation of bridges and approaches thereto over the navigable waters of the United States;

**AND WHEREAS** the Secretary of Transportation has delegated the authority of Section 502(b) of that act to the Commandant, U.S. Coast Guard by Section 1.46(c) of Title 49 Code of Federal Regulations;

**AND WHEREAS** before construction is commenced, the Commandant must approve the location and plans of any such bridge and may impose any specific conditions relating to the construction, maintenance and operation of the structure deemed necessary in the interest of public navigation, such conditions to have the force of law;

**AND WHEREAS** the - **COMMONWEALTH OF MASSACHUSETTS** - has submitted for approval the location and plans of a bridge to be constructed across the Taunton River between Fall River and Somerset, Massachusetts;

**NOW THEREFORE,** This is to certify that the location and plans dated February 1997 are hereby approved by the Commandant, subject to the following conditions:

1.   No deviation from the approved plans may be made either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Commandant.

2.   The construction of falsework, cofferdams or other obstructions, if required, shall be in accordance with plans submitted to and approved by the Commander, First Coast Guard District, prior to construction of the bridge.  All work shall be so conducted that the free navigation of the waterway is not unreasonably interfered with and the present navigable depths are not impaired.  Timely notice of any and all events that may affect navigation shall be given to the District Commander during construction of the bridge.  The channel or channels through the structure shall be promptly cleared of all obstructions placed therein or caused by the construction of the bridge to the satisfaction of the District Commander, when in the judgment of

DEC  5 1997

**Bridge across the Taunton River between Fall River and
Somerset, Massachusetts**

(8-97-1)

the District Commander the construction work has reached a point where such action should be taken, but in no case later than 90 days after the bridge has been opened to traffic.

3.     Issuance of this permit does not relieve the permittee of the obligation or responsibility for compliance with the provisions of any other law or regulation as may be under the jurisdiction of the  U. S. Army Corps of Engineers, New England Division; State of Massachusetts: Department of Environmental Protection; Division of Marine Fisheries, or any other federal, state or local authority having cognizance of any aspect of the location, construction or maintenance of said bridge.

4.     All parts of the existing to be replaced bridge across the Taunton River, mile 1.8, not utilized in the new bridge shall be removed down to or below the natural bottom of the waterway, except that all parts of the bridge 200 feet on either side of the centerline of the channel shall be removed down to or below an elevation of 40 feet below Mean Low Water and the waterway cleared to the satisfaction of the District Commander.  A period of 270 days subsequent to the opening of traffic on the new bridge, mile 2.1, will be allowed for such removal and clearance.  Should the permittee decide to retain the west abutment or any portions of the bridge, for any reason, the permittee must first obtain permission from the U. S. Army Corps of Engineers, or any other authority having cognizance over structures other than bridges in navigable waters of the United States.

5.     The location of, and materials and methods to be used in construction of, the pier protection fender system as shown on the approved plan sheet 5 (of 5) dated February 1997 shall be submitted to the District Commander for approval prior to commencing construction of such system.

6.     Clearance gauges shall be installed and maintained in a good and legible condition by and at the expense of the owner of the bridge.  The type of gauges and the locations in which they are to be installed will be submitted to the District Commander for approval.

7.     When the proposed bridge is no longer used for transportation purposes, it shall be removed in its entirety or to an elevation deemed appropriate by the District Commander and the waterway cleared to the satisfaction of the District Commander.  Such removal and clearance shall be completed by and at the expense of the owner of the bridge upon due notice from the District Commander.

8.     The approval hereby granted shall cease and be null and void unless construction of the bridge is commenced within three years and completed within five years after the date of this permit.

N. E. MPRAS
Chief, Office of Bridge
Administration
U. S. Coast Guard
By direction of the Commandant



# Exhibit D

**FINDINGS OF FACT**

**PROPOSED REPLACEMENT OF THE BRIGHTMAN STREET BRIDGE
OVER THE TAUNTON RIVER**

Applicant

Commonwealth of Massachusetts

Massachusetts Highway Department
Ten Park Plaza
Boston, MA 02116-3973

Prepared by:   Ernest J. Feemster, Bridge Management Specialist
               November 3, 1997

               First Coast Guard District
               Battery Park Building
               New York, NY 10004

ENCLOSURE(5)

## I. ADMINISTRATIVE EVALUATION:

1.  a. **Applicant's Name:**  Massachusetts Highway Department

b. **Date of Application:**  Initial formal request was made May 27, 1994 though the application was not complete at that time.  Mylar plan sheets depicting the proposed bridge were initially received by letter of April 28, 1997 and this constituted the final application.

2.  **Navigability determination:**  The waterway and bridge are listed in COMDTPUB P16590.1, "Bridges over the Navigable Waters of the United States - Atlantic Coast," the waterway is tidal through the bridge, and the waterway supports commercial navigation upstream of the proposed bridge site.

3.  **Proposed bridge:**

a.  Date of plans:  February 1997

b.  Type of Bridge:  double-leaf, twin bascule, highway bridge carrying four lanes.  The draw opening is to be located at the center of the channel instead of along the westerly channel edge as presently exists.

c.  Legal authority for proposed action:  the General Bridge Act of 1946, as amended (33 U.S.C. 525-533)

d.  Dimensions of the navigational opening:

(1)  **Vertical clearance:**  minimum 60.5 feet (18.44 meters) above Mean High Water under the closed bascule span; unlimited in the open position throughout the navigational channel

(2)  **Horizontal clearance:**  minimum 200 feet (60.96 meters) normal to channel axis

(3)  **Length of project:**  The bridge length will measure 1,725 feet (525.78 meters) between abutments.

(4)  **Width of project:**  100 feet-7.25 inches (30.66 meters) out-to-out

e.  Location of project:

(1)  Waterway name: Taunton River

(2)  Milepoint:  2.1 miles (3.38 kilometers).  This is a change over the existing bridge mileage of 1.8 miles (2.90 kilometers) since the new bridge is to be relocated 1500 feet upstream (between bridge centerlines) when measured at the navigational channel.

2

(3)  **Name of nearest city and state:** between City of Fall River and Town of Somerset, Bristol County, Massachusetts

f.  Purpose of project:  construct new bridge to replace deteriorated, functionally-obsolete bridge.  The project would also correct navigational deficiencies, significantly improve frequent interruptions to vehicular traffic caused by bridge openings, and would address capacity deficiency of the nearby U.S. Route 6/S.R. 138/S.R. 103 intersection in Somerset.  The bridge carried (on average) over 40,000 vehicles per day in 1985. This is projected to increase to over 66,000 in the year 2010.

g.  Cost of low level bridge with only sufficient clearance to pass high water: not applicable

h.  Increase in bridge cost attributable to navigational clearance:  Table 12 on page 230 of the EA indicates that a bridge with a horizontal width of 200 feet would cost $12.75 million more than a bridge similar to the existing one. (This is based on 1987 estimates).  The existing bridge, due to its inadequate horizontal clearance, has resulted in substantial monetary losses owing to economies of scale, vessel and bridge damage due to allisions with the bridge, necessity to utilize more tugs, and loss of vessel transit time.

4.  **Existing bridge:**

a.  Name of bridge: Brightman Street (U.S. Route 6, State Route 138) Bridge.  Same as proposed.

b.  Milepoint:   1.8 miles (2.90 kilometers)

c.  Type of bridge:  double-leaf, bascule highway bridge carrying four traffic lanes

d.  **Special operating regulation governing the drawbridge:**  none

e.  **Dimensions of vertical and horizontal clearances:** minimum 27 feet (8.23 meters) vertical above Mean High Water in the closed position and unlimited in the open position for a horizontal width of 98 feet (29.87 meters) normal to the channel axis

f.  **Date(s) of original permit and/or amendments:** original permit issued June 2, 1906 by the Secretary of War.  No approved plans are on hand for this permit.

g.  Extent of removal:  All parts of the existing bridge are to be removed to a minimum of 40 feet below Mean Low Water within the navigation channel and to the natural bottom or ground line outside the 400-foot navigation channel, except that the west abutment may be retained to be used as part of a proposed

3

fishing pier.  This pier would require the prior approval of the Corps of Engineers and would restore access to the waterway to those fishermen who fish off the existing Brightman Street Bridge.

5.  **Present governing bridge or aerial structure on the waterway:**  the Conrail Railroad Bridge at Taunton, Massachusetts governs both horizontal and vertical clearance on the waterway

(1)  Milepoint:  15.7 miles (25.27 kilometers)

(2)  Horizontal clearance:  6 feet (1.83 meters)

(3)  Vertical clearance:  4 feet (1.22 meters)

6.  **Protests or complaints, if any, against existing bridges on the waterway:**  numerous complaints and allisions have occurred at this bridge owing to its minimal horizontal clearance, undesirable siting of channel opening on the west side of the waterway, and absence of a fender system for several years on the east side of the channel opening.

7.  **Waterway characteristics:**

a.  Width of the waterway at bridge site:  The new bridge will be located approximately 1500 feet north of the existing bridge at a location where the waterway measures approximately 1600 feet (487.68 meters) wide as scaled from the navigational chart.

b.  Depth of the waterway at bridge site:   work is to be over a Corps of Engineers navigation project channel with a project depth of 35 feet.  Potential exists for the channel to be dredged to 40 feet.

c.  Other limiting factors:  none

8.  **Summary of preliminary conferences and early coordination or scoping efforts with applicant and/or other interested parties:**  Page 151 and succeeding pages, and Appendix B of the environmental assessment and other documentation indicates that the following formal coordination occurred:

a.  Various local task force meetings were conducted by the Southeast Regional Planning and Economic Development District (SRPEDD), agent acting for Massachusetts Highway Department (previously Massachusetts Department of Public Works).  No federal agency was in attendance at most of these meetings.

b.  Meeting of November 19, 1985 with the applicant, SRPEDD, and agents for the applicant.  Discussed the various alternatives and requirements of the bridge permit process.

4

c.  Public informational meeting on December 3, 1985 in Somerset to receive comments on proposed alignments and other aspects of the proposal to replace the bridge.

d.  Inter-agency meeting January 7, 1986.  Discussed the various alternatives and environmental concerns surrounding each.

e.  SRPEDD held a navigational meeting on the Battleship Massachusetts (permanently moored just upstream of the Braga Bridge) at Fall River Massachusetts on July 23, 1987.  The meeting consisted of pertinent navigational interests and attempted to determine navigational clearances required for a replacement bridge.

f.  Public hearing of October 25, 1988 held in Somerset. This hearing was to acquaint the public with the Draft Environmental Assessment.

g.  Meeting of August 26, 1993 between the Coast Guard, Massachusetts Highway Department and Howard Needles, design consultants.  Discussion on horizontal clearance including COE 1968 navigation project for a 300 foot width for the Brightman Street Bridge.

h.  The Coast Guard held a navigational public meeting on September 1, 1994 in Somerset.  This hearing disclosed that a 150-foot horizontal clearance appeared to be acceptable to existing waterway users.

9.  **Public Notification:**

a.  (1)  Date of Public Notice:  August 1, 1994

(2)  Adjacent property owners notified:  property owners were notified via our public notice.  A listing is included in Enclosure 7.c of the case report.

b.  Date of CG Local Notice to Mariners:  August 10, 1994

c.  Date of CG Public Hearing:  only a navigational public meeting was conducted by the Coast Guard.  See Section I.8.h above.

10. **Summary of views of governmental agencies, navigational interests or other interested parties.**

The Coast Guard public notice solicited comments on proposed bridge replacement but also announced a navigational public informational meeting to be held September 1, 1994 and invited persons desiring to speak to submit a written request.  Several letters of response to the proposal were submitted and details are provided below beginning with Paragraph (a).  Additionally, one letter of request to speak at the public hearing was

5

received.   Various persons spoke at the public hearing with none requesting a horizontal clearance in excess of 150 feet and none opposing any of the navigational aspects of the proposed bridge.

The Rivers and Harbors Act amended in 1968 as part of the authorization for the Corps of Engineers navigation projects, stipulated that the Brightman Street Bridge be modified to provide 300 feet horizontal clearance.   The Coast Guard recognized that this legislation was counter to the applicant's proposal to provide a 150-foot wide channel, so the Coast Guard previous to our public hearing, advised the applicant of this contradiction.   Congressman Barney Frank advised at the hearing that he had begun legislative procedures to allow for a 150-foot minimum opening and to repeal the requirements of the legislation requiring a 300-foot opening.

A speaker at the hearing also implied that downstream bridges leading from the ocean to the Brightman Street Bridge provide only about 150 feet horizontal clearance.   He also expressed alarm that the Coast Guard is requiring 300 feet horizontal clearance needlessly.   Though no response was appropriate at that time,  the record should state that such claims are erroneous. The only downstream bridge on the Taunton River is the fixed Braga (I-195) Bridge which provides a minimum 400 feet horizontal clearance (135 feet vertical).   To reach the Atlantic Ocean from the Braga bridge, a vessel would only have to access the Mount Hope Bridge over Mount Hope Bay (400-foot horizontal) and the Jamestown-Newport Bridge over the East Passage of Narrangansett Bay (1500-foot horizontal).

The following letters of comment were received:

        a.   Fall River Chamber of Commerce letter of August 10, 1994 - stated that the project was important to the Chamber of Commerce and requested an opportunity to speak at the public meeting.

        b.   Montaup Electric Company letter of August 30, 1994 - stated that the proposed 150-foot horizontal clearance was adequate for existing and prospective traffic expected at their facility.

The Coast Guard acknowledged receipt of the letter by our letter of September 13, 1994.

        c.   Stanley M. Golembewski undated letter received September 14, 1994 - stated that the applicant is proposing 150 feet horizontal clearance and the Coast Guard is requiring 300 feet horizontal clearance.   Suggested as an alternate that a suspension bridge be built to eliminate traffic congestion and manning expense incurred with use of a movable bridge.

The Coast Guard by letter of September 26, 1994 provided the basis whereby the 300-foot horizontal clearance was required, i.e., the specifics of the COE-enacted 1968 (amended) law requiring same. Stated also that based on our public meeting, a clearance of 150 feet was found acceptable provided the 1968 law is repealed as Congressman Barney Frank stated he would have done. We also added that use of a suspension bridge had been investigated by the Federal Highway Administration, lead federal agency, and was found unacceptable based on aesthetics and cost.

        d.    Jeanne Auclair letter of September 15, 1994 - provided her justification for the bridge replacement to proceed and requested that the work proceed. Also stated that 150 feet horizontal clearance was more than adequate for the bridge in view of the existing 98 feet horizontal clearance.

The Coast Guard by letter of October 19, 1994 advised the respondent that Massachusetts Highway Department had resumed the design phase of the bridge replacement project and that a formal application is expected. Added that a horizontal clearance of 150-200 feet is being contemplated by the applicant.

## II.   NAVIGATIONAL EVALUATION:

    1. **Do vessels engaged in emergency operations (i.e., law enforcement, fire, rescue, emergency dam repair, etc.), national defense activities (i.e., cruisers, fuel barges, munitions ships, etc.) or channel maintenance (i.e., dredges, dam and levee repair, etc.) operate on the waterway?**

Vessels engaged in emergency operations would be expected to operate on the waterway. Such a vessel would likely consist of a Coast Guard vessel since no other emergency vessels operate in proximity of the bridge. The proposed horizontal clearance of the Brightman Street movable bridge is to increase substantially such that any Coast Guard emergency vessel would be able to access the bridge.

National defense vessels would have no need to access the waterway upstream of the bridge since no such facilities are upstream and there is no identified need for such vessels to do so. Existing clearances and depths are sufficient to pass a large percentage of such vessels, nevertheless. The proposed bridge would be expected to accommodate any such vessel.

Vessels engaged in channel maintenance would have occasion to use the waterway upstream since a Corps navigation project exists upstream. Additionally, the Corps of Engineers has indicated they will require the applicant to dredge the proximate areas of the existing bridge to attain a 400-foot wide channel with a depth of 35 feet. The existing bridge and proposed bridges,

being movable, can accommodate any such vessels engaged in dredging, and the proposed bridge can better respond to such vessels since its clearances will be superior to the existing bridge.

**2. Has the Corps of Engineers completed or does it plan to complete a federal navigation project on the waterway?**

Yes. The existing project through the bridge, designated, "Fall River Harbor, Massachusetts," last modified in 1968 provides for a channel 40 feet deep, 400 feet wide from deep water in Mount Hope Bay northeasterly to the wharves at Fall River with a turning basin at the farthest upstream point. Wider widths are specified at the bends. Additionally, the project provides for altering the Brightman Street Bridge to provide a clear channel width of 300 feet. Various other adjuncts are included in the Corps project. This 1968 project has not been accomplished and depths of only 35 feet have been provided thus far. The Corps of Engineers has advised that portions of the 1968 project have been deauthorized and that dredging to 40 feet is not likely due to absence of a suitable spoil disposal area for the contaminated sediments. Additionally, legislation was passed (by Public Law 104-59 (November 28, 1995) to amend the 300 foot width for the Brightman Street Bridge and to provide for construction of a bridge having a horizontal clearance of less than 300 feet.

No specification of vessels to be accommodated by the project channel has been made by the Corps, however, the Coast Guard prepared an analysis of relative risk factors for vessels utilizing the proposed bridge. This analysis included consideration of vessels up to 50,000 gross tons, 733 feet in length, 102 feet beam and draft of 38.9 feet. Height of such vessels was not pertinent since the proposed bridge is to be a moveable bridge with unlimited clearance in the open position. Also, it should be noted that existing depths will not accommodate the largest vessels studied.

Removal of the existing bridge will result in a 98-foot wide channel existing, with shoaling areas adjacent, in a waterway with a project width of 400 feet. The Marine Safety Office, Providence, Rhode Island has stated a preference to have this "knuckle" area dredged. The Coast Guard advised the COE of this by letter of 1 October 1997. [See Enclosures 14]

Another project designated, "Taunton River, Massachusetts," was adopted in 1930 and was modified in 1948. It begins on the Taunton River about three miles upstream of the Fall River industrial-commercial area and extends upstream to the City of Taunton. It provides for a channel 12 feet deep and 100 feet wide and has various other adjuncts. This project was completed in 1940 (except for inactive parts) and is mainly for benefit of pleasure craft.

8

3. **Describe the present and prospective recreational navigation. Will the proposed bridge affect the safe, efficient movement of any segment of the present or prospective recreational fleet operating on the waterway?**

Recreational sailing, power boating and sport fishing occurs upstream of the existing bridge as evidenced by existence of several mostly small marinas, a public launch, a boat club, and a yacht club upstream.   The largest berthing area has about 100 slips and the greatest winter storage is for about 200 vessels. Southeast Regional Planning and Economic Development District (SRPEDD) statistics indicate in the attachment with their letter of August 31, 1994 that the existing bridge (minimum vertical clearance 27 feet) was required to open 646 times for recreational vessels in 1993.   The EA estimates (page 40), for recreational vessels, that fewer than 30 openings of the proposed bridge will be required in the year 2010.

4. **Describe the present and prospective commercial navigation and the cargoes moved on the waterway.   Will the proposed bridge affect the safe, efficient movement of any segment of the present or prospective commercial fleet operating on the waterway?**

There is presently only one active water-dependent, commercial facility upstream of the proposed bridge, the Montaup Electric Company.

Montaup converts fossil fuels to energy but has only two boilers, of which only one is  operational, so operations have been "scaled-down" accordingly.   It is not economically feasible to repair the inoperative boiler so replacement is the only viable alternative, if and when the local economy is stimulated to the extent that this is viable.   Coal is the principal commodity delivered to this facility and this is done about 1.5 times per month.   Additionally, oil is delivered about 1 to 2 times per year by tug-assisted vessel.

Shell Terminal, recently closed to business, previously received petroleum products mainly by tug-and-barge, receiving 67 deliveries in 1993 according to the SRPEDD.   This total had been representative of an overall decline in such shipments.   Though this terminal is no longer in business, possibility exists for the facility to reopen or for another owner to utilize the site for similar type operations.   The proposed bridge, having superior clearances, would meet the needs of any such operations.

Due to the minimal horizontal clearance of the existing bridge, orientation of the navigational channel span on the west edge of the channel, and the inability of the bridge owner to repair the fender system in a timely manner, there have been numerous allisions with the bridge by barges and tugs since about 1979.

9

These allisions resulted mainly because mariners were forced to favor the side of the narrow channel which had the most serviceable fendering. The draw in the closed position is also relatively low (27 feet minimum) so the bridge must open for almost all commercial vessels, causing congestion to vehicular traffic on adjoining roadways. In 1979 the bridge was damaged by an allision such that the bridge was closed to vehicular traffic for several months until repairs could be made, and a similar incident occurred in 1981. Due to severe damage to the fender system during those times, the Captain of the Port at Providence, Rhode Island issued an operation order in August 1981 specifying that, "out-bound transits of vessels of at least 1,000 gross tons must be on the flood tide." This order was amended in 1983 to pertain specifically to barges but the order has since expired. Mariners continue to voluntarily comply with the provisions of this order, though no official order is now in effect, and allisions with the bridge have been virtually eliminated.

Commercial fishing vessels are docked upstream and also must transit through the bridge. The SRPEDD has reported by letter of August 31, 1994 that 364 openings of the draw occurred in 1993 for fishing vessels.

The proposed bridge would incorporate greatly improved navigational clearances (which would reduce openings by an estimated 81 percent) and provide for optimum siting of the navigational channel span. This would greatly improve safety for present commercial traffic and allow for use of barges with larger-capacity and use of higher capacity tanker vessels instead of tug and barges presently used almost exclusively. The result would be more economical, efficient operations with corresponding savings (millions of dollars, page 6 of the EA). The Final EA estimates, page 40, that in the year 2010, less than 225 openings per year will be for commercial vessels if the proposed bridge is constructed. All fishing vessels presently using the waterway would be able to pass safely under the proposed bridge without requiring an opening. The proposed bridge replacement project should result in safer more efficient flow of vehicular traffic owing to a significant reduction in bridge openings, and should provide much greater competitive and economic advantage to commercial vessel usage on the waterway upstream.

   5. Will the proposed bridge block access of any vessel presently using local service facilities (i.e., repair shops, parts distributors, fuel stations)?

No, since no such facility is in the footprint of the proposed relocated bridge. In addition, clearances of the proposed bridge will exceed those of the existing structure.

   6. Are alternate routes by-passing the proposed bridge available for use by vessels unable to pass the proposed bridge?

No, however, no such route will be required since the proposed bridge will provide improved navigational clearances.

**7. Will the bridge prohibit the entry of any vessels to the local harbor of refuge?**

No, since the new bridge will accommodate much larger vessels owing to its improved navigational clearances.

**8. Will the proposed bridge be located within one-half mile of a bend in a waterway?** No

**9. Are there other factors (i.e., dockages, lightering areas, existing bridges, etc.) located within one-half mile of the proposed bridge which would create hazardous passage through the proposed structure?**

No. The proposed bridge will be about 1500 feet upstream of the existing bridge and for a period of time during construction, some portion of both bridges will be in place at the same time. This has been reviewed by the pilots and waterway users and none have indicated a problem with this situation. The Coast Guard will coordinate construction methodology and scheduling with marine interests.

**10. Do local hydrologic conditions (i.e., wave chop, cross currents, tides, shoals, etc.) increase the hazard of passage through the proposed bridge?**

No. The bridge area is relatively exposed so the effects of wind and cross currents are a little greater than normal but not to such an extent as to pose undue problems. The proposed bridge location similarly should not pose a problem.

**11. Do local atmospheric conditions (i.e., strong, prevailing winds, fog, rapidly developing storms, etc.) increase the hazard of passage through the proposed bridge?**

No. Effects of wind are presently a little greater than normal due to the area being relatively exposed but such effects do not significantly affect transit. Effects of wind similarly should not affect transits through the proposed bridge.

**12. Have guide clearances been established for the waterway?** No.

**13. Is navigational lighting required? Why?**

Yes. Such lighting exists presently and will be required for the new bridge.

**14. Is a protective bridge fendering system required? Why?**

11

Yes.   The existing bridge has a fender system and the new bridge will require a fender system, which is shown on  plan sheets.

15. Are clearance gauges required?  Why?  Yes.  Openings of the bridge cause traffic congestion on surrounding roads, so a clearance gauge would limit openings to vessel that require them.

16. State any other factors considered necessary for the safe, efficient passage of vessels through the proposed bridge. Why?  none

## III  ENVIRONMENTAL EVALUATION:

### 1. NEPA considerations :

a.   Identify lead agency:  Federal Highway Administration (FHWA)

b.   Identify cooperating agencies:  U.S. Coast Guard, and U.S. Army Corps of Engineers

c.   Type of environmental document:  FONSI

d.   Date(s) document(s) approved:  May 2, 1989 by FHWA. This FONSI is located on the first page of the Final EA.  An environmental reevaluation was prepared and the FHWA prepared a finding of no significant changes dated November 25, 1997.

e.   The Coast Guard has prepared its own FONSI dated November 25, 1997.

### 2.    Water Quality Certification (WQC):

The Massachusetts Department of Environmental Protection issued WQC by permit letter dated September 26, 1997.  EPA was notified of this by telcon of October 10, 1997 and expressed no objection or comment.

### 3.    Coastal Zone Management (CZM):

Massachusetts has a federally approved coastal zone management program and the proposed project is within the zone.   The applicant's certification is in its application for a Section 9 bridge permit dated February 10, 1997 (under application section page 5).   They also stated after-the-fact by letter of November 3, 1997 that they applied for concurrence on May 12, 1997.  The Massachusetts Office of Coastal Zone Management concurred in the applicant's certification by letter of October 2, 1997.

### 4.  Floodplains:    Is the proposed project in the base floodplain?

Yes.  A portion of the proposed piers and abutments will be within the 100-year floodplain, elevation +14.7, but no portion of the superstructure will be.   A hydraulic analysis was performed  (EA, page 100) which concluded that the proposed

alternative would not affect the flood level in the Taunton River and impacts of construction would be insignificant relative to the river's 530 square-mile drainage basin.

The proposed project will comply with DOT Order 5650.2. There will be no risk to or result from the proposed action. There will be no probability of loss of human life or substantial damage caused by the proposed action. No significant impacts on natural and beneficial floodplain values will occur. The project will provide no substantial support for direct or indirect development in the floodplain.

### 5.    Historic Properties:

The proposed project will have a no adverse impact on historical structures as indicated on page 250 of the EA and in the Advisory Council on Historic Preservation's concurrence dated May 25, 1989. Though the project has been revised slightly since that time, as attested to in the applicant's letter of November 10, 1997, such changes are not expected to affect the initial finding.

### 6.    Section 4(f):

The proposed project will not have any impact on properties protected under Section 4(f) [See page 112 of the EA]. In accordance with 23 CFR 771.135(p)(5)(i), there is no use involved in an action which has a No Adverse Effect, and 4(f) does not apply.

### 7.    Wetlands:

The most up-to-date compilation of wetlands impacts is contained in the Water Quality Certification (WQC) dated 26 September 1997. It indicates that 57,546 square feet of freshwater vegetated wetlands and 556 square feet of saltmarsh wetland will be impacted in Somerset, and 16,303 square feet of freshwater wetland will be impacted in Fall River. The total volume for freshwater wetland impact represents a minor refinement of the total found in the Wetland Mitigation Details Report. The Section 9 Bridge Permit application dated February 10, 1997 (page 6 under application section and Exhibit E) also provide freshwater wetland impact totals since refined slightly by the WQC.

Mitigation for the wetland losses by the proposed project will be accomplished through the replication of wetlands in order to replace lost functions and values. Freshwater wetland losses will be mitigated adjacent to an existing wetland in Somerset in the form of creation of 83,000 square feet of replacement wetlands. Saltmarsh wetlands losses will be mitigated on approximately a 4:1 basis by replication on the Somerset side, and following removal of the bridge on the Fall River side. At

13

least a 75 percent re-vegetation rate must be achieved in the replication areas by the second growing season.

The EA provides wetland impacts of the proposed bridge construction; however, these impacts have been greatly refined by more up-to-date information. The Wetlands Finding is found on page 108 of the EA.

### 8. Fish and Wildlife:

The land areas adjacent to the bridge and roadway project are developed, containing vegetation and wildlife endemic to a disturbed area. Such terrestrial species exist only in small scattered plots. The project is not expected to have any noticeable impact on such terrestrial species due to use of hay bales, geotextile mats and normal construction procedures. To mitigate for potential impact to terrestrial wildlife, landscaping will be provided after construction to replace that lost during construction.

The proposed project could potentially impact fish and wildlife in the waterway itself due to increase in turbidity associated with construction of the new bridge, and removal of the old, as with any such project. Various procedures will be implemented to off-set such impacts such as use of cofferdams and siltation screens, and placement of demolition debris in upland approved areas. Shellfish beds, and fish reproduction and feeding areas also exist within the waterway but none are within the zone of impact of the work.

Anadromous fish runs are known to occur on the river; however, pile-driving and construction of cofferdams and siltation screens will not be done March 15 to June 15 and during September and October to eliminate impacts to such fish. Impacts to fish and wildlife are detailed beginning on page 97 and then again on page 108 of the EA. The WQC permit specifies that no work can be conducted within the Taunton River between February 1 and April 30 unless approved by the State Division of Marine Fisheries. This certification, also, contains other provisions to protect fish and wildlife resources.

No threatened or endangered species or critical habitat exist in the project area.

### 9. Noise.

A noise study was conducted wherein six sensitive sites were studied. It was found that there were no substantial changes in noise so as to require abatement and that of the three sites approaching or exceeding the 2010 abatement criterion of 67 decibels, two of the three sites would have approached a similar level, even without the proposed project. Noise abatement

criteria were considered for the three sites but were not determined to be feasible since any viable noise barriers would block vital arterials or private driveways.

During construction, mitigative measures will be implemented such as: scheduling of construction operations to minimize interference with noise-sensitive activities, restricting heavy truck access to certain streets and to time of day of operations, and ensuring that all construction equipment is fitted with silencers and other noise-reduction devices [See page 8 of the Section 9 Application under the Application Section].

### 10. Air.

An air quality analysis was conducted which showed that non-methane hydrocarbons, carbon monoxide, and nitrogen oxides would decrease in the build years when compared to the no build. This would result due mainly to reduction in vehicle miles travelled as a result of the project. During construction, fugitive dust will result but these particles are expected to be larger and to settle within a short distance. Dust control measures, such as watering of affected areas, application of dust palliatives, and the use of dust covers for trucks will be included in the construction contract, according to the Final EA.

The project, occurring in an ozone non-attainment area, also is consistent with the approved state implementation plan for air quality and is included in the Transportation Improvement Program (TIP) of the Southeast Regional Planning and Economic Development District. This project is funded by the FHWA utilizing Title 23 monies. As a result, it is under the authority of the Transportation Conformity Rule of the Clean Air Act. Compliance with the SIP and TIP renders the project exempt from preparation of a formal conformity determination.

### 11. Environmental Justice.

Executive Order 12898 (February 11, 1994) regarding environmental justice, is not applicable since the proposed project does not involve any property displacements, and since the date of the EA preceded this order.

### 12. Other Impacts:    None.

## IV. CONCLUSIONS:

### 1. Navigation.

It is the opinion of the District Commander that the proposed bridge replacement project, based on the preceding facts, provides for the reasonable needs of existing and prospective navigation on the waterway.

15

**2. Environment.**

Based on a full consideration of the preceding facts, the final environmental assessment dated May 2, 1989, and other environmental information prepared by Massachusetts Highway Department and their agents, and approved by the FHWA, it is the opinion of the District Commander that the proposed action will not cause any significant, adverse, environmental impacts.

## V.   RECOMMENDATIONS:

It is recommended that a permit for the proposed bridge action be issued with the following conditions:

1.   Include the Corps of Engineers, New England Division; and the Massachusetts: Department of Environmental Protection, and the Division of Marine Fisheries in the disclaimer condition of the permit.

2.  That construction of the pier protection system be in accordance with approved plan sheet 5 (of 5) dated February 1997 and that the material and method for constructing the fender system be submitted to and approved by the District Commander prior to commencement of such construction.

3.   That clearance gauges be installed and maintained in good and legible condition by and at the expense of the owner of the bridge.   The type of gauges and the locations in which they are to be installed will be submitted to the District Commander for approval.

4.   That all parts of the existing to be replaced Brightman Street Bridge across the Taunton River, mile 1.8, shall be removed downs to, or below, an elevation 40 feet below Mean Low Water within the navigation channel and to the natural bottom or groundline outside the 400-foot navigation channel, except that the west abutment need not be removed.   The waterway shall be cleared to the satisfaction of the Commander, First Coast Guard District.   A period of 9 months subsequent to the opening to traffic of the proposed bridge, mile 2.1, will be allowed for such removal and clearance.   The proposed method and schedule for demolishing the existing bridge shall be submitted to the District Commander for approval prior to commencing such removal.

5.   That work commence within three years and be completed within five years of permit approval.

16

# Exhibit E

*The Spectator 8/10/05*

# Bridge could block LNG tankers from coming

**By GEORGE AUSTIN**
Editor

SOMERSET — Today, many cars and trucks go over the Brightman Street Bridge between Somerset and Fall River. But when a new bridge is built, congressmen James McGovern and Barney Frank want the current bridge to remain so that liquefied natural gas tankers cannot reach the site where Hess would like to build a liquefied natural gas terminal.

"We're not declaring victory at this particular point, but clearly if we get our way, it will be impossible to bring the tankers to Weaver's Cove," Rep. McGovern said.

The congressmen have inserted the provision into a federal transportation bond bill. Most people in the area oppose a liquefied natural gas terminal proposed by Weaver's Cove Energy for the former Shell Oil site in Fall River just across the Taunton River from Somerset.

Many public officials and residents in both Somerset and Fall River are concerned about possible explosions or fires, terrorist attacks, impact on the river environment and boat traffic.

Rep. McGovern said that judging from the reaction from Hess on the bill, if the congressmen get their way, it would kill the LNG deal.

James Grasso, a spokesman for Weaver's Cove Energy, said the bridge would have to be demolished in order to build the LNG terminal on the former Shell Oil site. He said LNG could not be piped to the terminal. Mr. Grasso said Weaver's Cove Energy will pursue legal and political action in order to get the Brightman Street Bridge demolished once the new structure is built.

"We will continue to pursue the development of the Weaver's Cove project," Mr. Grasso said.

Mr. Grasso said Weaver's Cove is disappointed that language "was slipped through the back door" in the transportation bill.

"It certainly appears to be at odds with the permits issued for the new bridge which requires the demolition of the old bridge to ensure the safety of shipping traffic in the Taunton River," Mr. Grasso said.

Rep. McGovern said the idea to use the current Brightman Street Bridge to block an LNG terminal came during a conversation he had with one of his aides, Patrick Norton, about the subject. He said Mr. Norton asked why not just keep the bridge up to stop the tankers from reaching Weaver's Cove. After that conversation, Rep. McGovern said he talked to Fall River Mayor Edward Lambert and Rep. Frank about the idea.

Rep. McGovern is a member of Congress's Transportation Conference Committee.

Rep. McGovern said keeping the Brightman Street Bridge standing after it is closed could have a positive impact on Somerset and Fall River. He said a pedestrian walkway and bicycle path could be constructed on the structure.

Rep. McGovern said there is $500,000 in the new Brightman Street Bridge project for such a project in the area where the bridge would be torn down as was originally planned. Rep. McGovern said the $4 million that has been set aside for demolition of the bridge once the new structure is up and running could be used to create one of the nicest pedestrian walkways and bike paths in Massachusetts. He said the work could also be a catalyst for economic development in Somerset and Fall River.

"I think it all fits very nicely," Rep. McGovern said.

# Exhibit F

Westlaw.

8/27/07 Boston Globe 1A
2007 WLNR 16711072

Boston Globe (MA)
Copyright 2007 Globe Newspaper Company

August 27, 2007

Section: National

**Politics    shape    Fall    River    project :    BRIDGE    WORK    GOES** ON AND
**ON**

Stephanie Ebbert
Globe Staff

FALL RIVER - The aging steel span over the Taunton River has gained fame in recent
years not as a bridge but as a barrier: Politicians have preserved the
101-year-old Brightman Street Bridge to try to block large liquefied natural gas
tankers from the river and to calm residents who feared an explosive terrorist at-
tack along their shores.

But the bridge itself is no paragon of safety. The rusted, structurally deficient
drawbridge, with an opening too narrow to accommodate large tankers, is among two
dozen steel bridges that state inspectors reexamined after a similarly designed
bridge collapsed in Minnesota Aug. 1. Last renovated in the early 1980s, the
Brightman Street Bridge was expected to close in the mid-1990s and was slated for
a $5 million demolition. Keeping it open to traffic now costs the state up to $1.5
million a year in repairs, Massachusetts Highway Department officials say.

Still, the bridge, which links Fall River and Somerset, could not be closed until
its replacement is completed - a project that began in 1998. If the new bridge
opens, as expected, in 2012, it will have taken only two years less to build than
the Big Dig.

The Brightman Street bridges are vivid examples of the way political forces have
shaped transportation decisions in recent years. A dilapidated old bridge is being
preserved as an obstacle to a politically unpopular project. And the construction
of its replacement 1,400 feet away has taken an unimaginably long time because the
state had to stagger the phases of construction to afford it.

"We use this now as an example of what not to do: Don't break up construction
phases based on funding," said Massachusetts Highway Commissioner Luisa M.
Paiewonsky. "It's universally acknowledged within MassHighway right now that that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

was a mistake."

When work on the new Brightman Street Bridge was starting, the state's costs for
the Central Artery construction were peaking, and precious little money was avail-
able for local projects. Though the Big Dig's pressures have eased, the competi-
tion for projects has not: The state now has a backlog of 588 bridges considered
"structurally deficient" by federal standards. The designation does not mean the
bridges are unsafe but that they need repairs or increased monitoring.

MassHighway estimates it would need about $200 million a year to start whittling
the list of problem bridges, but it has typically only spent about $150 million.
To repair and rehabilitate all the state's bridges would require $2.4 billion in
additional funding over two decades, according to a March report by the Transport-
ation Finance Commission.

"Any way you look at it, they are falling further and further behind," said Steph-
en J. Silveira, commission chairman.

 The commission is about to issue a follow-up report, which will recommend
strategies for raising more money for the state's neglected roads, rails, and
bridges. But for years, politicians have shrunk from the politically toxic altern-
atives before them - increasing gas taxes, tolls, or shifting scarce resources
from other projects. Even after the Minnesota bridge collapse, which brought the
need for bridge maintenance into sharp relief, President Bush rejected calls for
increasing the gas tax to pay for it.

"The state funds dried up four or five years ago because of governors who refused
to raise more income for the MassHighway Department to do projects," said Roland
Hebert, the transportation planning manager for the Southeastern Regional Planning
and Economic Development District. He said the halting pace of construction on the
new Brightman Street Bridge brought with it new costs.

"Unfortunately, the state got caught in this massive price increase for concrete,
steel, blacktop, and the price of this bridge practically doubled," Hebert said.
"If they'd have finished it within six years after they started, they'd have fin-
ished it within $120 million."

By the time the state awarded the contract for the last and largest chunk of the
work, it cost $186 million - 60 percent more than expected, said Erik Abell,
MassHighway spokesman. That work calls for building the 1,700-foot bridge's deck,
supporting structure and adjoining roadways. The contracts now total $273 million.

"It's kind of a running joke here that the bridge may never get done," said Edward
M. Lambert Jr., Fall River's mayor. Meanwhile, repairs often inconvenience motor-
ists by closing traffic on the existing bridge, which carries an estimated 42,200
vehicles a day.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The old bridge got new life two years ago when politicians seized upon it as a
handy obstacle to a seemingly unstoppable LNG project. Weaver's Cove Energy, a
subsidiary of Hess LNG, had already won federal approval to redevelop a 73-acre
former marine terminal, where large LNG tankers would visit at least once a week.

To block the tankers, US Representative James McGovern, a Worcester Democrat whose
district includes Fall River, inserted language in a 2005 federal transportation
bill that blocked federal funding for the demolition of the old bridge and commit-
ted $500,000 to restore it as a footpath or an emergency access route - even
though the bridge is too weak to carry fire engines.

Yet even he cites the condition of the bridge as evidence of the need for more
state transportation funding. "It is, by almost all accounts, not a safe bridge,"
McGovern said. "But people are still traveling on it, largely because it has not
been a political priority by the state's leaders. We are very, very lucky that
there hasn't been a catastrophe there."

The Federal Highway Administration prioritizes bridge replacements using a "suffi-
ciency rating" - a formula that takes into account factors such as the structure's
condition and traffic volume. A bridge that scores below 50 percent is considered
a candidate for federal replacement funding. The Brightman Street Bridge scored a
devastating 6 percent.

Though most bridges should carry trucks of 20 tons or more, the Brightman Street
Bridge's capacity has been downgraded and is now restricted to trucks weighing
less than 9 tons. Ambulances can make the passage, but fire trucks cannot.

In December, inspectors found that the steel beams supporting the bridge's side-
walks were in poor condition, pockmarked by holes and laden with heavy rust. Vi-
brations shudder through the sidewalks each time a truck rattles over the bridge's
joints. Railings once painted green are peeling. Rotted timber and gaps between
ties along the drawbridge offer a disturbingly clear view of the river below.

Like many bridges, the Brightman also has steel trusses that are considered to be
fracture-critical - meaning that if one fails, the bridge could feasibly collapse.
Some components are corroded, so highway officials have stepped up their inspec-
tions to examine the bridge every six months and have added supports to shore up
structural components.

Lambert and McGovern stress that no one aims to overhaul the bridge to its origin-
al condition; that could cost nearly $40 million. But even restoring it for pedes-
trian and emergency use could cost as much as $21 million, according to a draft
report of alternatives drawn up by consultants last May.

"That's the taxpayers of Massachusetts that are going to pay for that - so some
other bridge somewhere is not going to get repaired," said Gordon Shearer, chief
executive of Weaver's Cove Energy.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Soon after the bridge was saved, Weaver's Cove found a way around it: Sending smaller tankers up the river more frequently. The US Coast Guard reconsidered its position and suggested that it might not permit the LNG project. But the developer said he will not be barricaded by a bridge.

"We aren't going away," Shearer said. "If the intent was to run us out of town, it hasn't worked and it's not going to work."

Stephanie Ebbert can be reached at ebbert@globe.com.

---- INDEX REFERENCES ----

COMPANY: FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION; HESS LNG; US COAST GUARD

NEWS SUBJECT:  (International Terrorism (1IN37))

INDUSTRY:  (Liquified Natural Gas (1LI62); Chemicals (1CH04); Gas Liquids (1GA11); Commodity Chemicals (1CO31))

REGION:  (Massachusetts (1MA15); USA (1US73); Americas (1AM92); Minnesota (1MI53); New England (1NE37); North America (1NO39))

Language:  EN

OTHER INDEXING:  (BRIGHTMAN; BRIGHTMAN STREET; BRIGHTMAN STREET BRIDGE; CENTRAL ARTERY; FEDERAL HIGHWAY ADMINISTRATION; HESS LNG; LNG; MASSACHUSETTS; MASSACHU-SETTS HIGHWAY; MASSACHUSETTS HIGHWAY DEPARTMENT; MASSHIGHWAY DEPARTMENT; MIN-NESOTA; NEW BRIGHTMAN STREET BRIDGE; SOUTHEASTERN REGIONAL PLANNING; TRANSPORTA-TION FINANCE COMMISSION; US COAST GUARD; WORCESTER DEMOCRAT)  (Ambulances; Bush; Cove; Cove Energy; Edward M. Lambert Jr.; Erik Abell; Gordon Shearer; Hebert; James McGovern; Lambert; Luisa M. Paiewonsky; MassHighway; McGovern; Roland Hebert; Rotted; Shearer; Stephanie Ebbert; Stephen J. Silveira; Vibrations; Weaver)

EDITION: THIRD

Word Count: 1564
8/27/07 BOSTONG 1A
END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Exhibit G

# Aerial View of the Old & New Brightman Street Bridges



# Exhibit H

## NAVIGATION REVIEW

### BRIGHTMAN STREET BRIDGE
### ACROSS THE TAUNTON RIVER, MILE 1.8
### BETWEEN FALL RIVER AND SOMERSET, MASSACHUSETTS

### May 8, 2007

## I.    BACKGROUND AND PURPOSE:

On December 5, 1997, the Coast Guard issued a bridge permit for a new bridge to replace the existing Brightman Street Drawbridge, Mile 1.8, Taunton River. Massachusetts Highway Department (MHD) was the applicant and the project was partially funded by the Federal Highway Administration. A condition of the permit required the existing Brightman Street Drawbridge to be removed following completion of the new bridge. On August 10, 2005 an Act of Congress changed the project by prohibiting the expenditure of federal funds for the removal of the existing Brightman Street Drawbridge and required MHD to continue to use the bridge as a pedestrian and bicycle bridge.

The Congressional Act significantly changed the navigational conditions in the bridge location by creating a couplet of non-aligned drawbridges. The First District Bridge Branch requested this office to review the navigational characteristics of the dual bridge situation due to our experience in studying bridges on a nationwide basis to determine whether they constitute unreasonable obstructions to navigation. It must be emphasized that this report is not a Truman-Hobbs study nor was it conducted to produce results that could be used in a Truman-Hobbs determination. This report does not identify navigational benefits to alternate actions and its content is neither constrained by the requirements of Truman-Hobbs studies nor restricted in its scope of navigational issues covered. The report is a review of navigational conditions that do and are expected to exist with the perpetuation of the drawbridge couplet.

The new bridge will also be a drawbridge and it will also be controlled by drawbridge operation regulations that have yet to be established. Due to the proximity of the bridges, the drawspans will be expected to operate simultaneously for large vessels. Given the variance in vertical clearances, the old Brightman Street Bridge is expected to open more frequently. A large vessel would not transit the drawbridge couplet without both bridges being open. This would be especially true of downstream transits. Consequently, the length of time the drawspans will be in the open to navigation position is expected to be longer. This issue can only be speculated upon at this time since the drawbridge regulations have not been established.

Presently the new bridge under construction is not a moveable bridge since only piers are constructed and there is no vertical clearance issue. However, at some point in the construction process the vertical clearance will be restricted when the navigation spans are installed. At that point the challenges presented by dual drawspans are expected to become an issue, the significance of which cannot be determined until the operation regulations are approved.

## II.    LOCATION:

The Brightman Street Bridge located at mile 1.8 Taunton River, carries U.S. 6 and State Route 138 over the Taunton River between Somerset and Fall River, Massachusetts. Fall River is located 49 miles south of Boston, 15 miles southeast of Providence, Rhode Island, and 8 miles west of New Bedford, Massachusetts. Interstate 195 crosses the Taunton River downstream of the Brightman Street Bridge.

## III.    DESCRIPTION OF BRIGHTMAN STREET BRIDGE:

The Brightman Street Bridge is a six span structure with a double leaf Scherzer rolling lift span and five Warren deck truss approach spans. The total length of the bridge is 931 feet with an out to out distance of 61 feet. The bridge carries two lanes of traffic in each direction. The bridge permit was issued on June 2, 1906. When in the closed to navigation position, the bridge provides 27 feet of vertical clearance above Mean High Water, and when open the vertical clearance is unlimited. The draw span is 113.5 feet from center-to-center of trunnion bearings and provides a 100-foot wide clearance between leaves when in the fully open position.

The piers consist of granite blocks supported on concrete footings. The navigation piers are protected by a timber fender system. The protection fender along the right descending side of the navigation channel extends 72 feet downstream from the base of the pier and has been recently renewed. The protection fender upstream of the east or left descending channel pier is being rebuilt. The face-to face distance between the protection fenders is 98 feet which sets the horizontal navigation clearance. The left descending channel pier had been exposed at its upstream until the recent construction of a new timber protection fender.. The protection fender extending downstream of the left descending pier has leaning piles.

### Zone of Influence:

The zone of influence (ZoI)is the area over which a bridge exerts an influence eon navigation by requiring the vessels to alter course, speed or both or make other adjustments to safely transit a bridge. The ZoI for the existing bridge is considered to be from a point one mile downstream of the old Brightman Street Bridge to the turning basis which is about one mile upstream of the bridge. Vessels are preparing for the downbound approach to the bridges immediately upon leaving the dock area. With both bridges in place the ZoI includes the impacts of both bridges due to their proximity. Although the bridges are separate structures, they function and are considered to be a single navigation issue by mariners. The bridges affect navigation from a distance upstream from the new bridge to an area downstream from the existing bridge. The vessels cannot resume normal speed and maneuverability until they are outside the bridge ZoI downstream of the bridge..

### Drawbridge operations

The operation regulation of the existing drawbridge are contained in 33CFR117.619 Taunton River and state:

> The Brightman Street Bridge, at mile 1.8, between Fall River and Somerset, shall open on signal, except that:

(1) From June 1 through August 31, the draw need not open for the passage of pleasure craft, 7 a.m. to 9:30 a.m. and 4 p.m. to 6:30 p.m., Monday through Friday, except holidays. The draw shall open on signal for commercial vessel traffic at all times.

(2) From November 1 through March 31, between 6 p.m. between 6 p.m. and 6 a.m. daily the draw shall open if at least a one-hour advance notice is given by calling the number posed at the bridge.

(3) From 6 p.m. on December 24 to midnight on December 25, and from 6 p.m. on December 31 to midnight on January 1, the draw shall open on signal if at least a two-hour advance notice is given by calling the number posted at the bridge.

## IV.    DESCRIPTION OF THE WATERWAY:

The Taunton River arises from the confluence of the Town River and Matfield River in northern Bristol County, Massachusetts and flows southward and drains into Mount Hope Bay at the city of Fall River, Massachusetts. Mount Hope Bay is an extension of Narragansett Bay. The total length of the river is 44 miles.

The federal authorized and maintained navigation channel is 400 feet wide in vicinity of the Brightman Street Bridge. The Coast Guard maintains buoys up to vicinity of Dighton, Massachusetts approximately 9.5 miles upstream of the bridge.

The governing bridge on the waterway is the Conrail Railroad Bridge located at mile 15.7, near Taunton, Massachusetts. This bridge provides a horizontal clearance of 6 feet and a vertical clearance of 4 feet.

The channel project depth at the Brightman Street Bridge is 35 feet and this depth is maintained to the commercial docks located about 1.6 miles upstream of the bridge.

## V.    DESCRIPTION OF COMMERCIAL NAVIGATION:

There is only one active water-dependent commercial facility upstream of the Brightman Street Bridge. The NRG, Inc. coal fired electric generating plant located along the right descending bank upstream of the bridge receives coal by ship and barge. A typical ship is 539 feet long by 75 feet wide and a typical barge is 475 feet by 75 feet. A pilot is required on tug and barge as well as ships.

A ship transiting the Brightman Street Bridge will be assisted by two tugs. Only one tug is used when the ship has a properly working bow thruster of adequate power. A barge transits the bridge with one tug pushing at the stern and another assisting at the head.

An unused bulk petroleum plant is located on the left descending back directly across from the power plant. The petroleum terminal that had been operated by Shell Oil discontinued operation in the mid-1990's. In 1993, the Shell dock received 67 deliveries, mainly by tug and barge.

There are two commercial fishing vessels, 60 to 70 feet in length, that have their homeport upstream of the bridge. J and J Marine in Somerset installs specialty equipment on yachts of 60 to 80 feet in length. Pleasure boats make up the largest number of vessels upstream of the Brightman Street Bridge.

## VI.    NAVIGATION CHALLENGES:

### 1. Existing Brightman Street Bridge

There are three contributing factors that make the Brightman Street Bridge difficult to navigate. The first is a navigation span that provides 98 feet of horizontal clearance. Another factor is the location of the navigation opening along the right descending side of the channel which prevents vessels from transiting down the center of the channel. Cross winds are the third factor that makes transiting the bridge difficult. Pilots are required for all vessels that transit the bridge. Pilots report that southbound barge departures can be delayed several days because of the cross winds. Most barge allisions occurred as vessels were transiting the bridge downbound.

An engineering study performed by the Federal Highway Administration over a six year period from 1980 to 1986, determined that 24 of 26 reported allisions involved barges, and 20 of these occurred while vessels were transiting downbound. One of the ship allisions reportedly resulted from a bascule leaf not in the fully open position. Vehicular traffic was interrupted for several months in 1979 because of a vessel allision. Another allision in 1981 prompted the Captain of the Port in Providence, Rhode Island to issue an operation order that vessels of at least 1,000 gross tons must transit downbound on a flood tide. This order was amended in 1983, to pertain specifically to barges. Mariners continued to comply on a voluntary basis even after the order expired. The bridge owner has estimated that during the life of the bridge, the cost of repairs related to allisions at about $30,000,000 in 2005 dollars.

The following table shows the reported bridge allisions from 1990 through 2006 as reported by the bridge owner:

| Year | Allisions reported |
|------|--------------------|
| 1990 | No bridge hits recorded |
| 1991 | 1 |
| 1992 | 1 |
| 1993 | 2 |
| 1994 | No bridge hits recorded |
| 1995 | 2 |
| 1996 | 1 |
| 1997 | No bridge hits recorded |
| 1998 | No bridge hits recorded |
| 1999 | No bridge hits recorded |
| 2000 | 2 |
| 2001 | 2 |
| 2002 | No bridge hits recorded |
| 2003 | No bridge hits recorded |
| 2004 | 1 |
| 2005 | No bridge hits recorded |
| 2006 | No bridge hits  recorded |

This reflects the reduction in commercial traffic due to the Shell Oil Terminal ceasing operations.

The following table show the commercial transits as reported by the bridge owner:

| Year | Upbound Transits | Downbound Transits |
|------|------------------|--------------------|
| 1985 | 766 | 767 |
| 1986 | 929 | 929 |
| 1987 | 974 | 975 |
| 1988 | 885 | 884 |
| 1989 | 898 | 898 |
| 1990 | 694 | 694 |
| 1991 | 486 | 487 |
| 1992 | 443 | 443 |
| 1993 | 527 | 528 |
| 1994 | 409 | 409 |
| 1995 | 401 | 401 |
| 1996 | 135 | 136 |
| 1997 | 130 | 131 |
| 1998 | 145 | 144 |
| 1999 | 106 | 106 |
| 2000 | 142 | 142 |
| 2001 | 205 | 205 |
| 2002 | 248 | 249 |
| 2003 | 134 | 134 |
| 2004 | 265 | 265 |
| 2005 | 283 | 283 |

The navigation span on the Brightman Street Bridge is located toward the right descending side of the navigation channel. The engineering study conducted in the mid-1980s determined the new bridge would correct the narrow navigation opening and improve the location of the navigation span in relation to the navigation channel.

## 2. The new Brightman Street Bridge.

The permit for the new Brightman Street Bridge was issued on December 5, 1997. The review process included a determination for the location of the channel piers. These locations were identified with the understanding the old Brightman Street Bridge would be removed and the removal was made a condition of the permit.

The new Brightman Street Bridge under construction is located about 1,500 feet upstream from the existing bridge. Substructure work is progressing with the horizontal clearance for the navigation span established. The navigation span on the new bridge is located farther east than on the existing bridge and provides 200 feet of horizontal clearance. The navigation span was moved to be more aligned with the axis of the channel. Drawings show a channel restriction as the old bridge is approached from each direction. The restriction extends outward from the left descending shore because the old bridge span is located near the right descending side of the channel.

The new bridge will have a vertical clearance of 60.5 feet above Mean High Water. This clearance would allow much of the recreational boat traffic to pass without requiring an opening. The number of openings required has been estimated to be reduced by 81 per cent. No reduction of bridge openings will be realized with the retention of the old Brightman Street Bridge.

5

An improved span location will also reduce the time the bridge is open for commercial traffic The permit for the new bridge stipulated the existing bridge would be removed once the new bridge was completed and that any part of the old bridge to be retained would require a permit from U.S. Army Corps of Engineers.

## 3. The old and new Brightman Street Bridge couplet.

A new highway bridge to be located at mile 2.1 Taunton River, or about 1,500 feet upstream from the existing bridge was permitted on December 5, 1997, and amended on August 23, 2006. The bridge amendment was requested for additional time to complete the new bridge and for minor design change that does not affect issues of this review.

When the permit for the new bridge was issued, commercial waterway users understood the off-set of the navigation spans would significantly add to the difficult bridge transit. The hardship caused by the off-set bridge spans would be tolerated during construction with the expectation the waterway would be much improved when the old Brightman Street Bridge was removed. The new bridge would not have been permitted as it was with a realization the old bridge was going to be retained.

The new bridge has the navigation span more properly aligned with the navigation channel than the old Brightman Street Bridge and the navigation span provides 200 feet of horizontal clearance or more than twice the opening on the old Brightman Street Bridge. The new bridge will have a vertical clearance of 60.5 feet above mean high water. Because most bridge openings are to accommodate pleasure craft that require less than 60 feet of vertical clearance, most of the draw openings will be eliminated which will have a very positive impact on vehicular traffic.

Public Law 109-59-August 10, 2005, required the existing Brightman Street Bridge to be maintained for pedestrian and bicycle access, and as an emergency service route. This stipulation perpetuates the navigation problems associated with the existing bridge that include a narrow 98 -foot navigation opening and bascule span being located near the right descending side of the navigation channel. Because the navigation openings do not align, mariners are faced with the additional difficulty of moving obliquely once through the old bridge so as to become aligned for the navigation span on the new bridge.

The compounded bridge problems include:

(1) A 98 foot horizontal clearance in a waterway that otherwise provides a navigation channel 400 feet wide.

(2) A navigation span that is toward the right descending side of the navigation channel.

(3) Navigation spans within 1,500 feet of one another that are not aligned and require mariners to move laterally between the bridges. This will require the bascule on the new bridge to remain open longer because of the maneuvering required to get through the old Brightman Street Bridge.

6

## VII.  SUMMARY

The Brightman Street Bridge has been allided with numerous times and the bridge owner reports damage repair costs have totaled about $30,000,000 over the life of the bridge.  The timber protection is currently undergoing extensive repairs.

The primary cause of the allisions have been a navigation span that provides 98 feet of horizontal clearance and the span not being aligned with the navigation channel.  The navigation span is located toward the right descending side of the channel.

Most of the allisions involved barge and tugs rather than ships.  The Captain of the Port Order requiring downbound transits to be made when the tide was flooding was directed at barge traffic.  Barge operators continued to voluntarily comply with this requirement even after the Captain of the Port Order expired.  The number of transits and allisions was significantly reduced when the Shell Oil terminal ceased operations in the mid-1990's.

The locations of channel piers for the new Brightman Street Bridge were positioned to be more aligned with the channel and as a result the navigation span on the new bridge is not inline with the navigation opening on the old bridge.  Transiting vessels are required to adjust their course line once passing through the existing old bridge so as to be aligned with the navigation channel on the new bridge.  The "crabbing" action adds time to the transit and when downbound the added time causes delays to vehicular traffic.

Quantifying the impact to navigation resulting from a 98 foot navigation span and the span not being aligned with the navigation channel would be possible with a more thorough examination of the data.  A more detailed analysis would consider the delays that occur when vessels can not transit the old Brightman Street Bridge because of high winds, time waiting at docks above the bridge or in an anchorage downstream of the bridge.

The adverse impacts to navigation caused by a 98 foot navigation span not aligned with the navigation channel were exacerbated by locating another bridge about 1,500 feet upstream.  The new bridge was designed to improve navigation as well as land traffic by aligning the navigation span with the channel and increasing the horizontal clearance to be more consistent with the channel.  Retaining the old Brightman Street Bridge not only nullifies the navigation improvements intended with the new bridge but makes navigation more difficult.  Maximum intended waterway improvement will only be possible with removal of the old Brightman Street Bridge.

## VIII. PHOTOGRAPHS



Photograph #1. The Brightman Street Bridge as viewed from a point along the right descending bank downstream from the bridge.



Photograph #2. The bridge protection fender being installed upstream along the left descending side of the navigation channel.



Photograph #3. The timber protection fender extending downstream from the right descending navigation pier



Photograph #4. The timber protection fender located downstream from the left descending navigation pier.



Photograph #5. The timber pier protection downstream of the left descending navigation pier.



Photograph #6. The timber protection fender as viewed looking downstream toward the right descending navigation pier.



Photograph #7. The piers and protection cells for the new Brightman Street Bridge as view from the bridge deck over the navigation span on the old Brightman Street Bridge.



Photograph #8. Another view of the new Bridghtman Street Bridge.



Photograph #9. Showing the Taunton River looking south from the Brightman Street Bridge
The Braga Bridge (I-195) can be seen in the distance.



Photograph #10. The Brightman Street Bridge as viewed from the top of the NRG, Inc. power station.

12



Photograph #11. The navigation span on the old Brightman Street Bridge, the navigation span on the new Brightman Street Bridge is off the left side of the photograph.



Photograph #12. The Shell Oil terminal as viewed from the top of the NRG, Inc. Power station.



Photograph #13. Showing the area between the Shell Oil terminal doc (far left) and the Brightman Street Bridge.



Image taken from U.S.C.G. Sector Lower New England GIS.

# Exhibit I

**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commander
First Coast Guard District

One South Street
Battery Park Building
New York, NY 10004-5073
Staff Symbol: dpb
Phone: 212 668-7195
Fax 212 668-7967

16592/1.8H/Taunton R/
/MA
April 3, 2006

From: Commander, First Coast Guard District
To:      Commandant (G-PWB)

Subj:  REQUEST FOR INVESTIGATION OF POTENTIAL OBSTRUCTIVE BRIDGE

1.  Bridge Permit 8-97-1 dated 5 December 1997, authorized replacement of the Brightman Street Bridge across the Taunton River, mile 2.1, between Somerset and Fall River, Massachusetts with a new bascule bridge.  Condition 4 of the permit required removal of the existing Brightman Street Bridge within 270 days after the new bridge is open to vehicular traffic.  At present the replacement bridge is under construction with an amendment being processed by D1 for extension of time and modification of plans.

2.  The replacement bridge, being constructed approximately 1500 feet upstream of the existing bridge, would significantly improve the horizontal clearance of the existing bridge and align the bascule span such that the drawbridge opening will be located near the center of the 400 foot federal channel.  This design would correct the undesirable orientation of the existing bridge opening on the west side of the channel.  In addition, the increased horizontal clearance of the new bridge design would address the inadequate horizontal clearance of the existing bridge to safely accommodate present and future navigation particularly in light of the increased vessel requirements of the Oil Pollution Act of 1990 (OPA 90).  These benefits will only be realized with the removal of the existing bridge.

3.  During the processing of the bridge permit for the replacement bridge a relative risk factor analysis was conducted by the Coast Guard to compare the risk of allision for various sized vessels transiting through a 98 foot opening (existing bridge) and bridges with greater clearance. The analysis indicated a twofold risk for vessels utilizing the waterway then and now as they transit through the existing bridge as compared to the proposed bridge.  The Environmental Assessment prepared by the FHWA in 1989 justifying the need for bridge replacement identified the narrow opening, misalignment of the opening span and the low vertical clearance as marine safety issues.

4.  The historic record shows numerous allisions with the existing bridge owing to the limited horizontal clearance and prevailing atmospheric and hydrologic conditions.  Thirteen allisions were reported between 1979 and 1981 with sixteen reported between 1988 and 1992.  In 1981 COTP Order NO 1-81 was issued by COTP, Providence regulating the transit of certain vessels through the existing bridge. A Southeastern Regional Planning and Economic Development District (SRPEDD) study dated November 1985 presented an analysis of the obstructive nature of the existing Brightman Street Bridge. Although marine patterns have changed somewhat over the past 20 years, oil and coal carrying vessels continue to transit the bridge facing hazards presented in the report.  The dictates of OPA 90 requiring existing and future vessels to be larger, further exacerbate the dangers of transit through the bridge. Most recently in 2001 the M/V *Somerset* allided with the bridge twice (superstructure and fender) on its inbound and outbound transits prompting a local investigation by the Marine Safety Office, Providence and D1 obr which concluded that the limited horizontal clearance combined with the failure to open the bridge to an angle beyond the plane of the fender faces contributed to the allisions.

16592
April 3, 2006

5.  On 21 November 2005, the First CG District published a notice and request for comments regarding navigation rules for Providence River, Narragansett Bay, Rhode Island and Mt Hope Bay, Massachusetts.   Among other things, the notice sought comments and recommendations on navigation safety rules for various waterways including the Taunton River.  By letter dated 22 December 2005, NRG, an energy company operating an electric generating plant in Somerset, MA, upstream of the existing Brightman Street Bridge offered navigational safety concerns for Mt Hope Bay and the Taunton River (copy enclosed).  The safety of vessels (ship and barge) delivering bulk coal and No. 6 fuel oil is a concern given the condition of the existing bridge and state of its fender disrepair.  The letter did not recommend nor support the section of recent federal legislation, the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005 (SAFETEA) which requires the existing bridge to remain in place after the replacement structure is completed.  NRG also expressed concern for the shift in current flow and induced sedimentation caused by construction of the new bridge as well as misalignment of the channel and bridge.  A vessel grounding north of the bridge was cited as evidence of the changed hydrologic conditions.  NRG concluded that if the existing bridge is to remain then realignment of its draw with the center of the channel and reconstruction of the fender system must occur to ensure marine safety.

6.  A second comment submitted in response to the above notice was received from Weaver's Cove Energy, LLC, an energy company planning to construct and operate a marine liquefied natural gas (LNG) receiving terminal upstream of the existing and new Brightman Street Bridges (copy enclosed).  Authorization to construct and operate this facility has been granted by the Federal Energy Regulatory Commission.  Besides objecting to the retention of the existing Brightman Street Bridge for the same reasons offered by NRG, Weaver's Cove Energy added that the bridge would present a serious navigational hazard to the anticipated LNG tankers that will transit to their LNG facility.   Weaver's Cove recommended that the Coast Guard investigate the navigational hazard perpetuated by retention of the old bridge.  The comment presents an historic summary of the obstructive nature of the bridge and the conclusions by the FHWA, Corps of Engineers, Coast Guard and the bridge owner, MHD, that the bridge should be removed.

7.  By letter dated 13 March 2006, Captain of the Port, Southeastern New England responded to Weaver's Cove Energy's revised plan to use smaller vessels to deliver LNG more frequently to the proposed facility.  This change in vessel use was prompted by SAFETEA and the inability to transit the 98 foot wide existing bridge with vessels having 145 foot beam which was the original LNG tanker of choice.  The COTP's letter cited numerous marine safety hazards engendered by retention of the existing Brightman Street Bridge, the proximity and misalignment of the channel through the two bridges and the anticipated volume and size of expected navigation.

2

Case 1:08-cv-00998-ESH    Document 1-10    Filed 06/10/2008    Page 4 of 4

16592
April 3, 2006

8. Given the history of allisions and the obstructive nature of the existing Brightman Street Bridge presently and in the future it is recommended that an obstructive bridge analysis be conducted. Please advise if we can assist in conducting this needed analysis.

GARY KASSOF
By direction

Enclosure:    1. Bridge Permit 8-97-1 dated 12/5/97
2. Relative Risk Factor Analysis (excerpt from 1997 Findings of Fact)
3. Excerpt from EA - 1989
4. D1 Federal Register Notice dated 11/21/05
5. NRG letter dated 12/22/05
6. Weaver's Cove Energy letter dated 12/21/05 w/ selected attachments
7. MSO Providence letter dated 3/13/06

Copy:     Commanding Officer, Sector Southern New England w/o enclosures

# Exhibit J

04/07/2006  11:34    212668875__    USCG BRIDGES OBR         PAGE  02/02
04/06/2006  13:13    202'  4046     CGHQ BRIDGE A'  'N        PAGE  02/02

**U.S. Department of**
**Homeland Security**

**United States**
**Coast Guard**



Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: G-PWB
Phone: (202) 267-0368
Fax: (202) 267-4049

16592
6 April 2006

# MEMORANDUM

From:    Commandant (G-PWB)              Reply to    G-PWB-1
                                          Attn of:    ASTEINBERGER
                                                      X7-6215

To:      Commander, First Coast Guard District (dpb)

Subj:    **PRELIMINARY INVESTIGATION OF THE BRIGHTMAN STREET BRIDGE**
         **ACROSS THE TAUNTON RIVER, MILE 2.1, BETWEEN SOMERSET AND**
         **FALL RIVER, MASSACHUSETTS**

Ref:     (a) CCGD1 (dpb) Memo 16592/1.8/Taunton R/MA dtd 4/3/06
         (b) COMDTINST M16590.5C

1. Based on analysis of the information forwarded by reference (a), it appears that the subject
bridge may constitute an unreasonable obstruction to navigation. For this reason, you are
authorized to proceed with a preliminary investigation as provided in reference (b).

2. Further, 7. C. of reference (b) process requires the district to analyze the navigation problems
associated with a bridge in order to identify the navigation benefits (in dollars) that will be
derived if the bridge is altered. In order to justify alteration of a bridge, the navigation benefit
must equal or exceed the cost of alteration.

3. Please coordinate your investigation with Mr. Frank Hall at fhall@comdt.uscg.mil or
202-267-0376. He will be available to assist you in conducting this investigation.

\#

# Exhibit K



**U.S. Department of Homeland Security**

**United States Coast Guard**

Commanding Officer
U.S. Coast Guard
Sector Southeastern New England

1 Little Harbor Road
Woods Hole, MA 02543
Phone: 508-457-3219
Fax: 508-457-3236-
Email: Edward.G.LeBlanc@uscg.mil

16000
October 24, 2007

BY CERTIFIED MAIL – RETURN RECEIPT REQUESTED

Mr. Gordon Shearer
Chief Executive Officer
Weaver's Cove Energy, LLC
One New Street
Fall River, MA 02720

Dear Mr. Shearer

This is my Letter of Recommendation issued pursuant to 33 C.F.R. § 127.009. It is issued in response to your Letter of Intent of May 12, 2004 proposing to transport Liquefied Natural Gas (LNG) by ship to your terminal in Fall River, Massachusetts using large tankers, as amended by your change of information letter dated February 2, 2006 proposing smaller LNG tankers. In making this recommendation, I have compiled and considered a comprehensive administrative record. A complete listing of the documents I considered in making my recommendation is contained in enclosure (1) of this letter, and those documents are incorporated by reference herein. This record includes the additional documentation submitted by you and your counsel in response to my May 9, 2007 letter. I also considered information obtained during my observation of a simulated transit on May 24, 2007, and my own observations of the waterway while onboard deep-draft vessels transiting through Mount Hope Bay and the Taunton River. Enclosure (2) contains my factual determinations, analysis, and detailed recommendations in arriving at an ultimate recommendation.

This Letter of Recommendation is based upon my review of the aforementioned record, and my observations and knowledge of current commercial vessel traffic using the transit route along which you propose. My ultimate recommendation is that the waterway from near Sandy Point, Prudence Island, Rhode Island at approximate position 41° 36' 21"N, 071° 18' 13"W to the proposed facility in Fall River, Massachusetts, is unsuitable from a navigation safety perspective for the type, size, and frequency of LNG marine traffic associated with your proposal.

As I have determined that the above described segment of the proposed transit route is unsuitable from a navigation safety perspective, an exhaustive analysis of the other segments of the intended transit route described in my letter of May 9, 2007 and other factors relevant to waterway suitability for LNG traffic, such as maritime security, were not further analyzed in detail. Therefore, no additional public meetings and workshops with state and local officials, to further address security risks, resource demands, capabilities and coordination requirements, will be held. Moreover, as I view the safety of navigation as paramount, my recommendation that the waterway is unsuitable generated no additional environmental documentation requirements.

16000
October 24, 2007

The environmental impact of my sole alternative holding that the waterway is unsuitable due to navigation safety determinations is discussed in the May 20, 2005 FERC final environmental impact statement, incorporated by reference herein. I therefore adopt that document.

The determinations, analysis, and ultimate recommendation as to the suitability of this waterway for LNG transits between Sandy Point and Weaver's Cove, as contained in this letter and its enclosures, would be referenced in concert with a Captain of the Port Order, should an LNG transit be attempted along this waterway segment. Such an order would be issued pursuant to my authority under the Ports and Waterways Safety Act of 1972, as amended by the Port and Tanker Safety Act of 1978, 33 U.S.C. §1223, et seq, among other authorities.

Should there be significant changes to the characteristics of the waterway prior to the expiration of FERC's approval order in July 2010, Weaver's Cove may submit a new Letter of Intent in accordance with 33 CFR §127.007.

If you feel aggrieved by this action, you may request reconsideration by me pursuant to 33 C.F.R. §127.015(a). Your request for reconsideration must be submitted to me, in writing, within 30 days of receipt of this letter. If the delay in presenting a written request for reconsideration would have an adverse impact on your operations, you may request to make an oral presentation, but your written request must be submitted within five days of your oral presentation.

If you have questions, my point of contact is Mr. Ed LeBlanc of the Sector Southeastern New England Waterways Management Branch. He may be reached at the address, phone number, and e-mail address listed above.

Sincerely,


ROY A. NASH
Captain, U.S. Coast Guard
Captain of the Port
Southeastern New England


Enclosure:  (1) Administrative Record
            (2) Determination of Unsuitability

Copy:  Commander, First Coast Guard District (d, dp, dl)
       Commander, Atlantic Area (Am)
       Commandant (CG-3PSO)
       Federal Energy Regulatory Commission
       Mass and RI Congressional delegations
       Mayor, City of Fall River
       Applicable state and local agencies

U.S. Coast Guard Sector Southeastern New England
Letter of Recommendation, Weaver's Cove LLC
Enclosure (1), Administrative Record

| | Date Signed / Published | Document Originator | Document Title or Subject |
|---|---|---|---|
| 1. | March 13, 2000 | Dr. A.M. Rothblum, Coast Guard Research & Development Center | "Human Error and Marine Safety." Presented at the Maritime Human Factors Conference 2000, Linthicum, MD, March 13-14, 2000. |
| 2. | January, 2004 | NOAA | Chart 13226, Mount Hope Bay |
| 3. | May 12, 2004 | Weaver's Cove LLC | Letter of Intent |
| 4. | September 1, 2004 | Coast Guard Marine Safety Office Providence | Docket CGD01-04-093, Notice, Request for Comments; Letter of Recommendation, LNG Facility Weaver's Cove, Fall River, MA |
| 5. | September 7, 2004 | Coast Guard Marine Safety Office Providence | Ports and Waterways Safety Assessment (PAWSA) Workshop Report, Narragansett Bay |
| 6. | May 20, 2005 | FERC | FERC Final Environmental Impact Statement (FEIS) |
| 7. | June 14, 2005 | Commandant (G-MSO-2), U.S. Coast Guard | Guidance on Assessing the Suitability of a Waterway for Liquefied Natural Gas (LNG) Marine Traffic, Navigation and Vessel Inspection Circular (NVIC) No. 05-05 |
| 8. | June 27, 2005 | City of Fall River, Massachusetts | Weaver's Cove Energy, LLC, Docket #CGD01-04-093 |
| 9. | July 7, 2005 (date received) | City of Fall River, Massachusetts | Weaver's Cove Energy, LLC, Docket #CGD01-04-093 |
| 10. | July 27, 2005 | Captain of the Port, Southeastern New England | Response to Fall River letter of June 27, 2005 |
| 11. | August 10, 2005 | Mitt Romney, Governor of Massachusetts | Weaver's Cove Energy, LLC Docket #CP04-36-00 |
| 12. | August 30, 2005 | City of Fall River, Massachusetts | Weaver's Cove Energy, LLC, Docket #CGD01-04-093 |
| 13. | October 26, 2005 | Marine Safety International | Brightman Street Bridge Simulation Report |
| 14. | December 27, 2005 | Commandant (G-MSO-2), U.S. Coast Guard | Petition for rulemaking regarding thermal and vapor dispersion zones |

U.S. Coast Guard Sector Southeastern New England
Letter of Recommendation, Weaver's Cove LLC
Enclosure (1), Administrative Record

| | | | |
|---|---|---|---|
| 15. | January 6, 2006 | Captain of the Port, Southeastern New England | Operations in the Vicinity of the Naval Undersea Warfare Center, Newport, RI |
| 16. | February 2, 2006 | Weaver's Cove LLC | Amended Letter of Intent |
| 17. | February 7, 2006 | City of Fall River, Massachusetts | Weaver's Cove Energy, LLC, Docket #CGD01-04-093 |
| 18. | February 17, 2006 | Senator Edward M. Kennedy, et al | Letter to FERC re: Weaver's Cove Energy |
| 19. | February 24, 2006 | City of Fall River, Massachusetts | Weaver's Cove Energy, LLC, U.S. Coast Guard Docket #CGD01-04-093, FERC Docket #CP04-36 |
| 20. | February 24, 2006 | Senator Lincoln Chaffee | Letter to Captain Mary E. Landry re: Weaver's Cove Energy Change of Information Letter |
| 21. | March, 2006 | NOAA | Chart 13227, Fall River Harbor |
| 22. | March 4, 2006 | Commander (dpb), First Coast Guard District | Memo regarding Brightman Street Bridge |
| 23. | March 7, 2006 | New England District, Corps of Engineers | Weaver's Cove Energy (WCE) proposed dredging of the Taunton River |
| 24. | March 8, 2006 | Senator Edward M. Kennedy, et al | Letter to Coast Guard Commandant re: Weaver's Cove Energy |
| 25. | March 13, 2006 | Captain of the Port, Southeastern New England | Letter to Weaver's Cove Energy re: Navigation Safety |
| 26. | March 13, 2006 | Senator Jack Reed, et al | Letter to Captain Roy A. Nash re: Weaver's Cove Energy |
| 27. | March 17, 2006 | New England District, Corps of Engineers | Docket number CP04-36-000 concerning Weaver's Cove Energy (WCE) proposed dredging of the Taunton River in conjunction with the construction of a Liquefied Natural Gas (LNG) Terminal in Fall River, Massachusetts |
| 28. | March 27, 2006 | Weaver's Cove LLC | Response to Captain of the Port, Southeastern New England, letter of March 13, 2006 |
| 29. | April 3, 2006 | KeySpan LNG | Weaver's Cove March 27, 2006 Letter |
| 30. | April 6, 2006 | Commandant (G-PWB), U.S. Coast Guard | Preliminary Investigation of the Brightman Street Bridge Across the Taunton River, Mile 2.1, Between Somerset and Fall River, Masssachusetts |

U. S. Coast Guard Sector Southeastern New England
Letter of Recommendation, Weaver's Cove LLC
Enclosure (1), Administrative Record

| 31. | May 5, 2006 | Representative David B. Sullivan | Weaver's Cove Energy |
|---|---|---|---|
| 32. | May 25, 2006 | Commander, First Coast Guard District | Notice of Proposed Rulemaking "Regulated Navigation Area: Narragansett Bay, RI and Mount Hope Bay, MA, Including the Providence and Taunton River". |
| 33. | June, 2006 | NOAA | Chart 13221, Narragansett Bay |
| 34. | June 28, 2006 | Captain of the Port, Southeastern New England | Status of Coast Guard review of Weaver's Cove proposal |
| 35. | August 21, 2006 | Weaver's Cove LLC | Weaver's Cove comments on Notice of Proposed Rulemaking |
| 36. | November 2006 | Weaver's Cove LLC | Environmental Assessment of the Use of Smaller Ships |
| 37. | November 22, 2006 | Weaver's Cove LLC | Waterway Suitability Assessment |
| 38. | February 21, 2007 | Weaver's Cove LLC | Additional Smaller LNG Ship Design, Navigational, and Operational Data |
| 39. | March 20, 2007 | Weaver's Cove LLC | Sandia Zones |
| 40. | April 3, 2007 | Captain of the Port, Southeastern New England | Response to Weaver's Cove regarding navigation issues |
| 41. | May 2007 | Northeast Marine Pilots | "Report on the Feasibility study of the Proposed Weaver Cove LNG Ship to transit from Sea to the proposed LNG terminal in Fall River" |
| 42. | May 8, 2007 | Eighth Coast Guard District Bridge Branch | Navigation Review, Brightman Street Bridge Across the Taunton River, Mile 1.8, Between Fall River and Somerset, Massachusetts |
| 43. | May 9, 2007 | Weaver's Cove LLC LLC | Initial reply to Coast Guard letter of May 9, 2007 |

U.S. Coast Guard Sector Southeastern New England
Letter of Recommendation, Weaver's Cove LLC
Enclosure (1), Administrative Record

| | | |
|---|---|---|
| 44. | May 9, 2007 | Captain of the Port, Southeastern New England | Preliminary Assessment of Suitability |
| 45. | May 25, 2007 | Baker Botts LLP | Transmittal of "Feasibility Report" from Northeast Marine Pilots |
| 46. | June 6, 2007 | Baker Botts LLP | Letter of Recommendation process |
| 47. | June 8, 2007 | Baker Botts LLP | Maritime Security |
| 48. | June 12, 2007 | Baker Botts LLP | Transmittal of Brightman Street Bridge Simulation Report from Marine Safety International |
| 49. | June 20, 2007 | City of Fall River | Weaver's Cove Energy LLC |
| 50. | July 18, 2007 | Weaver's Cove LLC | Detailed rebuttal to Coast Guard letter of May 9, 2007 |
| 51. | July 27, 2007 | Baker Botts LLP | Letter of Recommendation process |
| 52. | August 9, 2007 | Captain of the Port, Southeastern New England | Consolidated response to eight letters from Weaver's Cove and Baker Botts LLP. |
| 53. | August 9, 2007 | Weaver's Cove LLC | Weaver's Cove comments on the city of Fall River's letter to the Coast Guard of June 20, 2007 |
| 54. | October, 2007 | National Oceanic and Atmospheric Administration (NOAA) | Coast Pilot 2, 36th Edition, Atlantic Coast:  Cape Cod, MA to Sandy Hook, NJ, 2007 |
| 55. | October 2, 2007 | Captain of the Port, Southeastern New England | Waterways Analysis and Management System (WAMS) Review, Narragansett Bay, Rhode Island and Mount Hope Bay, Rhode Island and Massachusetts |
| 56. | October 16, 2007 | Coast Guard Marine Information for Safety and Law Enforcement (MISLE) database | Vessel Critical Profile, M/V WINTERSET |
| 57. | October 16, 2007 | Coast Guard Marine Information for Safety and Law Enforcement (MISLE) database | Vessel Critical Profile, M/V CLIPPER RANGER (renamed to M/V ANDERMATT) |

Page 4 of 4

## A. PROCEDURAL BACKGROUND

1. On December 19, 2003, Weaver's Cove, LLC submitted an application to the Federal Energy Regulatory Commission (FERC) to operate a liquefied natural gas (LNG) terminal in Fall River, Massachusetts. On May 20, 2005 FERC issued its final environmental impact statement for the proposal and on July 15, 2005 FERC authorized Weaver's Cove, in its Order CP-04-0036-000, to site, construct and operate an LNG terminal. On April 17, 2006 FERC denied numerous requests to reconsider their decision and reopen the proceedings.

2. One of the conditions precedent to operation was the completion of a Coast Guard Letter of Recommendation finding the waterway suitable for the transit of LNG tankers. The complete FERC docket can be found at http://www.ferc.gov/industries/lng/indus-act/terminals/exist-prop-lng.asp.

3. On May 12, 2004, Weaver's Cove submitted a letter of intent (LOI) pursuant to 33 CFR §127.007 to transport LNG by ship to its proposed terminal in Fall River, Massachusetts by way of Narragansett Bay and Mount Hope Bay, portions of which lie in Rhode Island. The original letter of intent proposed 50-60 transits per year to the Weaver's Cove terminal, using tanker ships 975' long by 145' beam, with a 37.5' draft.

4. On August 10, 2005, the President signed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Pub.L. 109-59. Section 1948 of that Act states that "no Federal funds shall be obligated or expended for the demolition of the existing Brightman Street Bridge…" That bridge, which crosses the transit route proposed by Weaver's Cove in its Letter of Intent, allows only vessels that may safely pass through the 98-foot wide horizontal opening to transit. Subsequent to the Act, Weaver's Cove submitted an amended LOI on February 2, 2006, proposing to use smaller tankers of approximately 725' long by 82' wide by 36' draft. These tankers would make about 120 to 130 deliveries each year. On February 21, 2007, Weaver's Cove provided information on modeling and simulations for its revised proposal. On May 9th, 2007, the Coast Guard Captain of the Port provided Weaver's Cove with the results of his preliminary analysis of the revised LOI, navigation simulations, and modeling information. Weaver's Cove continued to submit information, though not requested, and eight additional submissions between May 9th and August 8th, 2007 were received. In addition, representatives for Weaver's Cove met with the Captain of the Port on May 24th, 2007, and September 4th, 2007, to present a simulated transit, and to discuss the Letter of Recommendation process, respectively.

## B. FACTUAL DETERMINATIONS

1. <u>General Description of Waterway</u>:  As described in the FEIS and the Letter of Intent as amended LNG tankers would transit the waterway to the Weaver's Cove waterfront LNG facility "via the East Passage of Narragansett Bay and the federal navigation channel in Mount Hope Bay and the Taunton River."  For the purposes of this Letter of Recommendation, the waterway described in the FEIS was further segmented to facilitate a navigation safety analysis.

2. <u>Waterway Segments</u>:

    a.  **Segment One**:  This segment of the waterway is approximately 12.5 nautical miles long, extending from the Narragansett Bay entrance buoy ("NB") north through the East Passage of Narragansett Bay and under the Newport/Pell Bridge to a point adjacent to Sandy Point, Prudence Island, Rhode Island.  The U.S. Coast Pilot 2 (Atlantic Coast:  Cape Cod, MA to Sandy Hook, NJ), published by the National Oceanic and Atmospheric Administration (NOAA) (see enclosure (1), document 54) describes this segment, commonly referred to as the "East Passage" as:

    > "East Passage, the principal passage in Narragansett Bay, extends between Rhode Island on the East and Conanicut and Prudence Islands on the west.  It is the most direct route to…Mount Hope Bay, and Taunton River.
    >
    > The Newport Bridge, a fixed highway suspension bridge, crosses East Passage about 3.6 miles above the entrance, between Jamestown and Newport…A privately maintained fog signal is sounded at the Bridge.
    >
    > The mean range of tide is 3.5 feet…In the entrance (to the East Passage) the flood current is often irregular.  There may be a long period of slack water preceding the flood, or there may be a double flood.  The flood reaches a strength of about 1.2 knots; the ebb is regular and averages 1.5 knots at strength."

    As described in FERC's FEIS (enclosure (1), document 6) "this segment is relatively wide (0.25 to 0.75 mile) and deep (60 to 120 feet)."  The Coast Guard periodically conducts a Waterways Analysis and Management System (WAMS) review of the aids to navigation system in this segment, the most recent completed in October, 2007, which found the aids-to-navigation system to be adequate for current users of the waterway.  Appendix A is a chartlet of Segment One, and more detailed narrative descriptions of this segment can be found in enclosure (1), documents 3, 6, 33, and 54, among others.

    b.  **Segment Two**:  This segment of the waterway is approximately 9.6 nautical miles long and extends from the East Passage at Sandy Point, Prudence Island,

northeasterly under the Mount Hope Bridge and through Mount Hope Bay to the area known at Borden Flats where the federal channel in Mount Hope Bay intersects with the private channel leading to the Brayton Point power plant. This segment includes areas of noteworthy infrastructure, including the Mount Hope Bridge and Roger Williams University, and the 400-foot wide federal channel in Mount Hope Bay. The controlling depth for this segment of the waterway is 35 feet MLLW. Weaver's Cove has proposed to dredge the Federal channel to a depth of 37 feet MLLW. The U.S. Coast Pilot 2 (Atlantic Coast: Cape Cod, MA to Sandy Hook, NJ), published by the National Oceanic and Atmospheric Administration (NOAA) (see enclosure (1), document 54) describes this segment, commonly referred to as "Mount Hope Bay" as:

> "Mount Hope Bay, in the northeastern part of Narragansett Bay, is the approach to the city of Fall River and Taunton River. There are two approaches to the bay. The approach from the Sakonnet River…is little used. The approach from East Passage is well marked, and with care 34 feet can be carried in the channel into the bay.

> Mount Hope Bridge crosses the entrance to Mount Hope Bay between Bristol Point and Rhode Island. The bridge has two lighted towers which are visible for many miles in clear weather and a racon. It is a high-level suspension highway bridge with a clearance of 135 feet.

> Borden Flats, the shoal area northward of the channel in Fall River Harbor, is marked by a light equipped with a fog signal.

> A Federal project provides for a channel 35 feet deep through Mount Hope Bay to about 0.9 miles above the Bright Street Bridge across the Taunton River at Fall River."

The Coast Guard periodically conducts a Waterways Analysis and Management System (WAMS) review of the aids to navigation system in this segment, the most recent completed in October, 2007, which found the aids-to-navigation system to be adequate for current users of the waterway. Appendix B is a chartlet of Segment Two, and more detailed narrative descriptions of this segment can be found in enclosure (1), documents 2, 3, 6, and 54, among others.



Figure 1A, Waterway Segment Two, Mount Hope
Bay:



c. **Segment Three:** This segment of the waterway is approximately 3.3 nautical miles long, and extends from Borden Flats northeasterly into the Taunton River, under the Braga Bridge, through the old and new Brightman Street bridges, to the proposed Weaver's Cove facility on the east bank of the Taunton River in Fall River, Massachusetts. This segment can be characterized as narrow, winding, and in close proximity to significant populations and infrastructure. Densely populated areas in close proximity to this segment include both Fall River and Somerset, Massachusetts; infrastructure includes three bridges and a 400 foot wide Federal Channel which serves the Dominion power plant at Brayton Point, and the NRG power plant opposite the Weaver's Cove site. The controlling depth for this segment of the waterway is 35 feet MLLW. Weaver's Cove has proposed to dredge the Federal channel in this area to a depth of 37 feet MLLW, and dredge the turning basin north of the Brightman Street bridge to a depth of 41 feet MLLW. The U.S. Coast Pilot 2 (Atlantic Coast: Cape Cod, MA to Sandy Hook, NJ), published by the National Oceanic and Atmospheric Administration (NOAA) (see enclosure (1), document 54) describes this segment, commonly referred to as the "Taunton River":

> At Fall River, two highway bridges cross Taunton River. The first, a fixed bridge at State Pier, has a (vertical) clearance of 135 feet; a privately maintained fog signal is sounded from the bridge. The second, Brightman Street Bridge, about 1.1 miles above the fixed bridge at State Pier, has a bascule span with a (vertical) clearance of 27 feet….In October 2000, a replacement bascule bridge was under construction about 0.2 miles above the

existing Brightman Street Bridge with a design clearance of 60 feet.

The mean range of tide is 4.4 feet at Fall River and 2.8 feet at Taunton.

In Taunton River the currents generally follow the direction of the channel and, except at bridges, do not hinder navigation.  The ebb is usually stronger than the flood.

The Coast Guard periodically conducts a Waterways Analysis and Management System (WAMS) review of the aids to navigation system in this segment, the most recent completed in October, 2007, which found the aids-to-navigation system to be adequate for current users of the waterway.  Appendix C is a chartlet of Segment Three, and more detailed narrative descriptions of this segment can be found in enclosure (1), documents 3, 6, 21, and 54, among others.

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 1B, Waterway Segment Three, Borden Flats and Taunton River:



(1) From approximately one mile south of the Braga Bridge, and continuously to the vicinity of the proposed Weaver's Cove site, the federal navigation channel lies in close proximity to downtown Fall River, and within 500- to 1,000-meters from this channel lie population density areas of 1,000 persons per square mile to over 9,000 persons per square mile. See in Figure 3-8 of the Weaver's Cove Waterway Suitability Assessment of November 22, 2006 (enclosure (1), document 37).

(2) At Battleship Cove, the USS MASSACHUSETTS museum ship hosts approximately 90,000 visitors annually, including approximately 24,000 students and scouts who sleep aboard the vessel for various functions throughout the year. This vessel is approximately 95 feet outside of the channel.

(3) As a tanker approaches the Braga Bridge from the south, it must turn approximately 55 degrees to port while passing under the bridge, in close proximity to piers and the USS MASSACHUSETTS. Conversely, when approaching the Braga Bridge from the north, a tanker must head directly towards the USS MASSACHUSETTS and the adjacent commercial piers, and then turn approximately 55 degrees to starboard to pass parallel to the USS MASSACHUSETTS and underneath the Braga Bridge.

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 2A, Passing USS Massachusetts Museum*



 *The USS Massachusetts is 681 feet long and lies approximately 95 feet outside of the
  navigation channel.

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 2B, Passing USS Massachusetts Museum



(4) The September 2004 Ports and Waterways Safety Assessment (PAWSA) identified the Taunton River in the Fall River metropolitan region (to include Somerset) as an area of "very high absolute risk" in terms of consequences from a hazardous materials release. (See enclosure (1), document 5.) Weaver's Cove was a participant in this Assessment. Consensus could not be reached when participants were asked if current and/or future mitigations could balance that risk. It is important to note that the 2004 PAWSA assumed:

    1. The old Brightman Street Bridge would be removed before LNG tanker transits would take place; and

    2. LNG tanker deliveries to Fall River would be about one per week.

(5) A notable feature of this segment is the proximity of the old and new Brightman Street bridges to each other, the difference in their horizontal opening clearances (98 feet and 200 feet, respectively), and the alignment of their openings with respect to each other, and to the Federal channel. These bridges and their impact

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

on the waterway are more fully discussed below.  See Figures 3A and 3B below for aerial views the Brightman Street bridges.

Figure 3A, Aerial View of Brightman Street Bridges from the southwest:





Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 3B, Aerial View of Brightman Street Bridges from the east:



(6) As illustrated in figure 3B, the separation between the nearly parallel old and new
Brightman Street bridges is approximately 1100 feet  (See enclosure (1), documents
13 and 16.  With the respect to the navigation channel, the bridge openings of the old
and new bridges are navigationally off-set, requiring a transiting vessel to stop (or be
stopped by tugs) between the bridges, be moved laterally approximately 100 feet, and
then proceed forward through the next bridge opening.  The opening of the old
Brightman Street bridge (southernmost of the two) is 98 feet wide and is located
adjacent to the western edge of the navigation channel.  The opening of the new
Brightman Street bridge is 200 feet wide and is located in the center of the navigation
channel.  When passing through the old Brightman Street Bridge on an inbound
transit, the new Brightman Street Bridge is directly ahead.  See Figures 4A and 4B.
Conversely, when passing through the new Brightman Street Bridge on an outbound
transit, the old Brightman Street Bridge is directly ahead.  See Figures 5A and 5B.

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 4A, Inbound through the Old **Brightman** Street Bridge



Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 4B, Inbound through the Old Brightman Street Bridge



Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 5A, Outbound through the New Brightman Street Bridge



Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 5B, Outbound through the New Brightman Street Bridge



(7) In its May 2007 feasibility report (enclosure (1), document 41), the Northeast Marine Pilots indicated concern about the adequacy of the bridge fendering system, particularly the fendering system of the old Brightman Street bridge. The Pilots suggest that the fendering in the old bridge "must be returned to the original design and status so that vessels can make contact with the fendering so that there is no damage to the bridge or the vessel." The report indicates that the fendering system has not been maintained properly over the last 25 years. Although an impact assessment of the fendering system of the new Brightman Street bridge was included with the original Weaver's Cove Letter of Intent, no similar impact assessment for the fendering system of the old Brightman Street bridge was submitted. (See enclosure (1), documents 3 and 16.)

(8) Current commercial traffic through the Brightman Street bridges consists primarily of coal carrying ships, tug/barge combinations, and occasionally heavy fuel barges to the NRG power plant. In nearly every instance tugs are required to safely complete navigation through the two Brightman Street bridges for any commercial vessel. Typical transits of commercial coal ships include, among other tugs, a tug tethered to the stern of the ship to serve as an additional brake and stopping mechanism to a ship's engines turning propellers in the astern direction. See Figure 6. A tethered tug

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

astern, while absolutely necessary to ensure a commercial vessel transiting through one Brightman Street bridge does not impact the other bridge, nonetheless essentially adds to the length of any tug/ship combination, further reducing available room for maneuvering between the two bridges

Figure 6, Tug Astern of coal ship, passing through old Brightman Street Bridge



(9) Other vessels:  There are other vessels that routinely berth adjacent to the channel, particularly in the vicinity of the Braga Bridge.  There, the channel passes within approximately 120 feet of the State Pier, which houses a container facility and shipping terminal.  Fishing and commercial container vessels routinely berth between the west end of the State Pier and the east edge of the shipping channel.  The USS MASSACHUSETTS museum is berthed to an appendage on the north side of the State Pier, and its stern is within approximately 95 feet of the channel.  See figures 7A and 7B.

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 7A, approaching State Pier & USS Massachusetts museum, & under the Braga Bridge



Figure 7B, passing State Pier, & under the Braga Bridge



(10)   With respect to navigating through the two Brightman Street Bridges, following are some factors that currently impact most commercial traffic using this waterway segment, and would likewise impact LNG traffic.

  (a)   Daylight.  There are currently no nighttime transits by commercial shipping traffic through the two Brightman Street bridges, and pilots will not make a night time transit with the current configuration of the waterway.  Daytime-only transits have been proposed as a Federal regulation.  See the notice of proposed rulemaking "Regulated Navigation Area:  Narragansett Bay, RI and Mount Hope Bay, MA, Including the Providence River and Taunton River", Coast Guard docket CGD01-06-052, published in the Federal Register on May 25, 2006, Vol. 71, No. 101, pages 30108-30112. (See enclosure (1), document 32.)

  (b)   Visibility.  Current practice by marine pilots calls for no transits in less than one mile visibility.

  (c)   Winds:  Current practice by marine pilots calls for no transit through the old Brightman Street Bridge when winds exceed 12 knots sustained, 15 knot gusts, on the beam.  Excessive wind on the beam decreases control and

maneuverability of the ship in close quarters situations, and could lead to allisions, collisions or groundings.

(d) Tides:  Outbound transits of the old Brightman Street Bridge are conducted on a flood tide only to ensure sufficient water flow over a vessel's rudder as it proceeds at very slow speed through the opening of the bridge.  Water flow over the rudder provides a vessel with some level of control over its own movement through the 98-foot wide bridge opening, where tugs are of limited effectiveness while the vessel is actually within the bridge opening.

(e) Inbound transits of a laden LNG tanker through the dredged channel in Mount Hope Bay and the Taunton River are possible only with sufficient tidal lift.  A delay in the transit while the tanker is in one of these channels could result in the vessel losing its tidal lift and could cause temporary grounding.

(f) Air Draft:   In the waterway from Sandy Point to the Weaver's Cove facility, the proposed LNG tankers would have to safely pass beneath the Mount Hope Bridge, the Braga Bridge, and overhead power cables in Fall River.  While Weaver's Cove provided no specifics as to the height of its proposed LNG tankers, it did state that the tankers would be designed to safely pass beneath the Mount Hope and Braga Bridges, each of which have a minimum clearance of 135 feet at Mean High Water.  The overhead power cables in Fall River have a minimum clearance of 150 feet at Mean High Water, so vessels designed to pass safely beneath the Mount Hope and Braga Bridges would also pass safely beneath the overhead power cables.

d. The Coast Guard Captain of the Port Southeastern New England, has personally transited Segment Three of the waterway on several occasions on commercial cargo and Coast Guard vessels to observe and gauge the factors affecting navigation safety.

e. The following additional factual information is provided in accordance with 33 CFR §127.009(d) regarding the waterway directly adjacent to the proposed facility:

(1). **Depths of the water**:  Proposed to be dredged to a depth of 41 feet MLLW alongside.

(2). **Tidal Range**:  Per the National Oceanic and Atmospheric Administration (NOAA), the tidal range between Mean High Water and Mean Low Water at Fall River, Massachusetts, is 4.36 feet, but can vary from as much as 5.41 feet mean spring range of tide to as little as 2.35 feet mean tide level.

(3). **Protection from the high seas**:  The site of the proposed Weaver's Cove facility in Fall River, Massachusetts, is approximately 25.4 miles inland from the entrance to Narragansett Bay.

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

(4).  **Natural hazards, including reefs, rocks, and sandbars**:  Other than insufficient depth of water outside of the 400 federal channel, and outside of the turning basin proposed to be deepened as proposed by Weaver's Cove, the natural hazards, reefs, rocks, and sandbars are as depicted on the NOAA charts 13221, 13226, and 13227.

(5)  **Underwater pipelines and cables**:  As depicted on NOAA charts 13221, 13226, and 13227.

(6)  **Distance of berthed vessel from the channel, and the width of the channel**.

    (a.)  **Proposed LNG vessel**:  As proposed, an LNG vessel berthed at the Weaver's Cove facility would be adjacent to, but not in, the Federal channel and would in fact be adjacent to a turning basin that Weaver's Cove proposes to widen to accommodate LNG vessels.

3.  WEAVER'S COVE PROPOSAL

a.  On May 12th, 2004, Weaver's Cove LLC submitted a Letter of Intent with respect its proposal to construct and operate a new waterfront facility handling LNG in Fall River, Massachusetts. (This is referred to as the "larger tanker proposal".)  The dimensions of LNG tankers, and frequency of tanker portcalls, proposed by Weaver's Cove are contained in Table 1 below.

b.  On February 2nd, 2006, Weaver's Cove LLC submitted a "Change of Information Letter of Intent to Operate a Newly Constructed Waterfront Facility Handling LNG."  The letter stated that, due to the retention of the existing Brightman Street bridge (a consequence of the SAFETEA-LU Act cited above), utilization of smaller size LNG vessels, with more frequent deliveries, was required.  (This is referred to as the "smaller tanker proposal").  The dimensions of LNG tankers, and frequency of tanker portcalls, proposed by Weaver's Cove in this letter are contained in Table 1 below.

Table 1 – Vessel Dimensions and Frequency of Shipments

| Proposed LNG vessels: | Length (ft) | Beam (ft) | Draft (ft) | Volume (m3) | Frequency of Shipments (annual) |
|---|---|---|---|---|---|
| Original LOI: (Letter of May 12, 2004) | 950 | 145 | 37.5 | 145,000[1] | 60 port visits (120 transits of the waterway) |
| Amended LOI: (February 2, 2006) | 725 | 82 | 36 | 55,000 | 120-130 port visits (240 – 260 transits of the waterway) |
| Amended LOI: (February 2, 2006), as modified by the Ship Design Report (February 21, 2007) and Environmental Assessment of the Use of Small Ships of November 2006 | 750[2] | 85[2] | 37.5[2] | 55,000 | 120-130 port visits (240 – 260 transits of the waterway) |

c.  Modeling:  Weaver's Cove submitted a letter with navigation modeling information to the Coast Guard on February 21, 2007.  The navigation modeling involved a ship of dimensions 732.2 feet long, by 78.8 feet wide, by 33.8 feet draft, and was conducted by Marine Safety International (MSI), on behalf of Weaver's Cove LLC.  The reports submitted for this modeling effort are contained in enclosure (1), document 38.  The Weaver's Cove transmittal letter with this modeling submission stated that the final design of the proposed smaller LNG tanker could not be determined, but suggested that the dimensions of the smaller tanker may extend to 750 feet long, by 85 feet wide, by 37.5 feet draft.  Additionally, in May 2007 a report was submitted by the Northeast Marine Pilots to Weaver's Cove regarding their assessment in participating in the modeling work at MSI.

(1) Some relevant comments from the report include:

(a) The Northeast Marine Pilots cautioned that the simulator had "inherent limitations" and that the tanker hull design had "not been proven."

---

[1] The Ship Design Report uses the figure of 155,000m$^3$ of cargo carrying capacity vice the earlier figure of 145,000 m$^3$ for the larger tankers.  The increase in cargo carrying capacity is attributed to refinements in cargo containment design coupled with the reduced space occupied by a newer, smaller, propulsion system and smaller fuel tanks.

[2] Weavers Cove has proposed a "range of ship sizes" up to and including the dimensions listed here.

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

    (b) The vessel modeled was not of the dimensions as that of the largest 'small tanker' now proposed, as noted in Table 2 below:

Table 2 – Vessel Dimensions

| | **Length (feet)** [3] | **Beam (feet)** | **Loaded Draft (feet)** |
|---|---|---|---|
| **Vessel Modeled** [4] | 732.2 | 78.8 | 33.8 |
| **Vessel Proposed** [5] | 750 | 85 | 37.5 |

    (c) The simulation modeling used "one tug on the stern acting as a brake" which is necessitated by the presence of the Brightman Street bridges in close proximity and nearly parallel to each other. While the size of the simulator tug is not specified, Weaver's Cove indicates that the typical length of actual tugs it would employ are from 92 to 95 feet. The length of the towline or distance between the simulated tanker and tug is not specified.

    (d) In its simulation report, the Northeast Marine Pilots stated that it had historically piloted vessels up to 90' wide through the old Brightman Street bridge, but has reduced that to 80' in large part because "the new bridge has been built in the center of the federal channel, while the old bridge is on the western limit of the federal channel. Therefore the two bridges do not line up and are in significantly close proximity to each other."

  d.  Weaver's Cove has proposed various measures to mitigate risks to navigation safety, including dredging the 35-foot deep Federal channel to 37 feet at MLLW, enlarging and dredging to 41-feet deep the turning basin that currently exists adjacent to the facility site, making aids-to-navigation improvements including additional buoys and enhancements to the NOAA PORTS Physical Oceanographic Real Time System, adding improved tanker organic maneuvering capabilities (e.g., bow and stern thrusters) and improved external capabilities such as the use of three tractor tugs and two pilots when maneuvering through the Brightman Street bridges.

---

[3] There is some ambiguity regarding the exact dimensions of the proposed LNG tanker. In its letter of February 2, 2006 (the "smaller tanker" proposal), Weaver's Cove indicates that the size of the proposed LNG tankers would be 725 feet long by 82 feet wide by 36 feet deep. In a subsequent letter dated February 21, 2007 ("Weaver's Cove Energy, LLC, Amended Letter of Intent, Additional Smaller LNG Ship Design, Navigational and Operational Data"), Weaver's Cove proposed a "range of ship sizes" up to and including the dimensions noted here. Consequently, the Coast Guard used the latest information provided by Weaver's Cove, which was for larger "small tankers".

[4] Per the May 2007 report of Northeast Marine Pilots "Report on the Feasibility study of the Proposed Weaver Cove LNG Ship to transit from Sea to the proposed LNG terminal in Fall River"

[5] Per Weaver's Cove letter of February 21, 2007

e.  The waterway through which LNG tankers are proposed to transit is described in section 4.12.5 of the FERC FEIS (enclosure (1), document 6), with one major exception. Per Table 4.12.5-1 of that document, LNG tankers would be required to transit under or through the four bridges listed. But, the FERC FEIS assumed that the old Brightman Street Bridge would be "replaced with a bascule type bridge that is to be completed in 2010." (See page 4-260). Per the SAFETEA-LU Act cited above, there are currently no plans to demolish the old Brightman Street Bridge, so that a fifth bridge, in addition to the four listed in Table 4.12.5-1, must be navigated by LNG tankers.

f.  In its letter of July 18, 2007, Weaver's Cove notes that coal ships are permitted to transit through the two Brightman Street bridges. Weaver's Cove states the "dimensions of the small LNG ships contemplated in (our) revised LOI are comparable to those of the coal ships" and argues that, when compared to coal vessels "comparably sized LNG vessels should be acceptable provided the handling characteristics of the smaller LNG ships are equal to or better than those of the coal ships."

C.  ANALYSIS:

1.  Waterway.

a.  **Segment One (entrance of Narragansett Bay to Sandy Point)**. The safety mitigations proposed by Weaver's Cove could potentially address the navigation safety risks associated with transiting this segment of the waterway, pending further maritime security and environmental impact analysis commensurate with the proposed smaller tankers and increased number of transits.

b.  **Segment Two (Sandy Point to Borden Flats)**. The safety mitigations proposed by Weaver's Cove, excepting that portion of the channel north of Mount Hope Point, could potentially address the navigation safety risks associated with transiting this segment of the waterway, pending further maritime security and environmental impact analysis commensurate with the proposed smaller tankers and increased number of transits. However, once a LNG tanker enters the 400-foot wide Federal channel at a point adjacent to Mount Hope Point, there are very limited options in terms of responding to a disabling incident or accident. In short, once a northbound LNG tanker enters the Federal channel in this segment, they are committed to completing the entire transit – there is no feasible alternative. As such, the navigation safety issues identified for Segment Three are inextricably linked to Segment Two north of the Federal Channel entrance. In the event of a disabling casualty in the Federal Channel in Segment Two for a vessel of the proposed length and draft there appear to be two options: either tow the tanker backwards out of the channel, or tow it through the channel all the way to the Weaver's Cove facility, both subject to sufficient under-keel clearance provided by a favorable tidal lift, among other constraints. Given the situation of the two Brightman Street bridges described

elsewhere in this Letter, the latter option is not feasible. The former option to be towed backwards down the channel would require extraordinary navigational maneuvers and present additional risks. Both options would require additional time, and would preclude use of the channel by other commercial traffic and most recreational traffic during the evolution.

c. **Segment Three (Borden Flats to the Weaver's Cove facility)**.

(1) Listed below are key factors affecting the suitability of this segment of the waterway with respect to navigation safety. The issue of the Brightman Street bridges is discussed in greater detail in below.

(a) Proximity of the waterway to population concentrations
(b) Proximity of the Brightman Street Bridges to each other.
(c) Dimensions and condition of the old Brightman Street Bridge.
(d) Channel offset between bridges.
(e) 55-degree turn required beneath and just north of the Braga Bridge.
(f) Close proximity of the channel to Fall River piers, vessels moored thereto, infrastructure (e.g., I-195/Braga Bridge) and USS MASSACHUSETTS museum complex.
(g) Conditions favorable to inbound and outbound transits are severely limited by proposed vessel's length, breadth, and draft, available daylight hours, tidal state, wind, minimum two-mile visibility, and infrastructure.

(2) The PAWSA assumptions that (1) the old Brightman Street bridge would be removed, and (2) transits would be about 50-60 each year are no longer accurate. The presence of an additional (retained) bridge, and the more frequently proposed deliveries (doubled), elevates the risk of an accident or incident and were not considered by the PAWSA.

(3) The configuration of the two Brightman Street bridges, as they relate to each other and the navigation channel, results in a compound navigational challenge when considering the proposed tanker's length, breadth, and draft dimensions, the number of assist tugs, and the application and coordination of security forces. The proximity and arrangement of the old and new Brightman Street Bridges to each other presents an elevated risk of the proposed vessel striking either or both bridges. The current navigational challenges have been recognized by both marine pilots and the Coast Guard, which has prompted a Federal rulemaking to impose vessel transit conditions and restrictions as described above.

(4) While approaching and proceeding through the Brightman Street bridges, the tanker would proceed with assistance from one to three tugs, and would at one or more points be completely stopped between the bridges while it moves transversely to align itself with the next bridge opening. This maneuver might be described as a "locking through" of the vessel between the old and new bridges, where towing vessels need to be most effective to mitigate limited

maneuverability of the vessel, compounded by the very limited maneuvering room for multiple vessels associated with the LNG tanker bridge transit in the area. This 'locking through' would occur up to 260 times per year under this small tanker proposal in a waterway segment having significant infrastructure and the greatest population concentration along the 25.4 nautical mile inland route. Maneuvering safely and repeatedly through and between both bridges needs to be virtually certain for the proposed frequent LNG vessel transits. The proximity and arrangement of the old and new Brightman Street Bridges to each other makes safe navigation highly challenging for the proposed vessels. Specifically, not only is the old 98-foot wide bridge narrow relative to the 85-foot wide tankers proposed, but a transiting vessel through the first bascule opening must stop forward momentum to avoid striking the second bridge in a very short distance (less that ¼ ship length). Once stopped, the vessel must be moved sideways approximately one hundred feet with tugs and/or bow and stern thrusters, to become aligned in the channel for passage through the opening of the new bridge. Once aligned with the new bridge opening, the vessel must transit through, and proceed approximately 0.7 miles to the Weaver's Cove berth. The reverse must occur on an outbound transit.

(5) A Coast Guard study has found that "about 75-96% of marine casualties are caused, at least in part, by some form of human error." Other studies have shown that human error has contributed to 84-88% of tanker accidents, and 75% of allisions. (Enclosure (1), document 1.) In addition to the narrow high tide transit window that would provide sufficient underkeel clearance, the close proximity of the Brightman Street bridges to each other, the narrow horizontal opening of the old bridge, and the channel off-set between the two bridges provide very little tolerance for human error while simultaneously introducing numerous risk factors. These risk factors are further compounded by wind, current, and the presence of security boats, among other things. A safe transit through these two bridges requires numerous mechanical and behavioral factors to succeed (not fail). Repeatable safe transits are dependent upon the highest probabilities of success for each of the component risk factors. The navigational maneuver that must be successfully executed in each transit to avoid an adverse striking of either bridge is considered very complex. The following risk factors, at a minimum, are deemed relevant to a safe transit:

(a) Risk/probability of helmsman error, resulting in a bridge allision.

(b) Risk/probability of engine order telegraph operator error, resulting in a bridge allision.

(c) Risk/probability of conning error by pilot(s)/master, resulting in a bridge allision.

(d) Risk/probability of human error by ship's bow and/or stern thruster operator, resulting in a bridge allision.

(e) Risk/probability of human error by any of three tug operators that adversely affects control of the tanker, resulting in a bridge allision.

(f) Risk/probability of mechanical failure in any of the three tugs adversely affecting control of the tanker while transiting a bridge, resulting in a bridge allision.

(g) Risk/probability of coordination error between pilots when two pilots are in the wheelhouse, or between pilot and the master, adversely affecting navigation safety during bridge transits, resulting in a bridge allision.

(h) Risk/probability of ship steering failure resulting in a bridge allision

(i) Risk/probability of loss of ship's main propulsion resulting in a bridge allision

(j) Probability of accurate vessel draft calculation, under-keel clearance, and transit time from sea to allow for bridge transit without grounding in the dredged channel.

(k) Probability of a clear channel without obstructions.

(l) Probability that favorable wind predictions are accurate and conservative for safe bridge transit, such that wind gusts do not set the ship onto a bridge while transiting.

(m) Risk of mechanical failure of bridge opening systems on the old bridge (assuming the bridge is normally in the down position).

(n) Risk of mechanical failure of bridge opening systems on the new bridge.

(o) Risk of electrical failure to bridge operating system (old bridge) (assuming the bridge is normally in the down position).

(p) Risk of electrical failure to bridge operating system (new bridge).

(q) Probability of bridge operator error in opening the old Brightman Street bridge to a full vertical position (assuming the bridge in normally in the down position).

Multiplying the probability of all of these risk factors, considered together for each transit of the bridges, while also considering the difficulty of the maneuver, leads only to a conclusion that the waterway is not suitable for marine traffic of the dimensions, type, and frequency proposed by Weaver's Cove.

d. The current practice by marine pilots is to restrict transits through the two Brightman Street bridges to daylight hours. A fundamental requirement for these transits is to have the very best visibility to judge the current, the wind, and to otherwise see all aspects of a vessel's movement through the narrow bridge opening; this is paramount. The current practice is a clear indication by vessel operators, marine pilots, and the Coast Guard that

night transits through the two Brightman Street bridges would elevate the risk, and consequently the waterway in the vicinity of the Brightman Street bridges is not suitable for night transits.

e.  As proposed by Weaver's Cove, the smaller tankers would be 725 to 750 feet in length. When transiting through the Brightman Street bridges, each tanker would be accompanied by a tug astern of approximately 100 feet in length, which would be "made up" to the tanker's transom by a towline extending approximately 50 or more feet. This tanker/tug combination would essentially act as a single vessel approximately 900 feet in length, attempting to execute precise maneuvers in the waterway segment between the Brightman Street bridges that is only about 1100 feet wide. This maneuvering would be attempted 240 to 260 times annually, and the tanker/tug combination would be accompanied by at least two additional tugs and a security flotilla, further complicating navigation safety. Maneuvering an LNG tanker with an 82- or 85-foot beam through a 98-foot opening, and preventing that same vessel combination of approximately 900 feet in overall length (tanker plus tug astern) from colliding with a bridge only about 1100 feet beyond the first bridge requires extraordinary precision and should only be attempted—if ever—in the most ideal of conditions, not 240 to 260 times per year in a variety of environmental conditions. Should any vessel(s)—not only LNG tankers, but even vessels carrying non-hazardous cargoes—of similar dimensions attempt such maneuvers I would have similar reservations in terms of navigation safety, particularly at such frequency.

f.  Given that the pilots, on their own volition and presumably in the interest of navigation safety, have reduced the maximum beam allowance for vessels currently transiting the Brightman Street bridges (none of which carry flammable cargo as defined by Federal regulation) to 80 feet (see enclosure (1), document 41), the Coast Guard can find no rationale to support a finding that the waterway is suitable for vessels with a beam of over 80 feet carrying 55,000 cubic meters of LNG, even after considering the enhanced maneuvering capability proposed for the smaller LNG tankers. Even with an 80-foot beam, the Coast Guard would not be likely to consider this segment of the waterway as suitable for the smaller LNG ships, for the reasons addressed elsewhere in this Letter.

g.  An accident while maneuvering an LNG tanker in the vicinity of the Brightman Street bridges could damage the fendering system and/or either bridge to the extent that the bridge(s) and the waterway may be closed to marine traffic for a prolonged period of time. In such a case, whether the LNG tanker is functionally damaged or not, the navigational effort to maneuver the tanker (presumably stern first) out of the Taunton River and Mount Hope Bay, to Narragansett Bay, would be extraordinary. Note that there is no practical turnaround option available in the 400' wide federal channel north of the Mount Hope Bridge for ships of the proposed length and draft, except in the turning basin adjacent to the NRG power plant facility, opposite the Weaver's Cove site. Although other vessels that currently transit this waterway (such as coal ships) could conceivably cause similar damage to either Brightman Street bridge, with similar adverse impacts, the dimensions and frequency of these vessel transits are far less than that proposed by Weaver's Cove. Additionally, coal vessels are not required to have a safety

and security zone enforced around them, and are not subject to a higher standard of care as prescribed for LNG tankers in Federal regulation.

h.  Simulation Modeling:

(1) Although not required, the May 2007 report of the Northeast Marine Pilots entitled "Report on the Feasibility study of the Proposed Weaver Cove LNG Ship to transit from Sea to the proposed LNG terminal in Fall River" (enclosure (1), document 41) was helpful.  Much weight has been assigned by Weaver's Cove to the simulation modeling conducted by the Northeast Marine Pilots at the Marine Safety International facility in Middletown, RI.  Simulation modeling is a valuable tool to test concepts and provide risk-free training in certain applications, but it is just that—simulation— and subject to limitations, such as those noted in the Pilots' report.  The Captain of the Port personally observed simulated transits of an LNG ship at Marine Safety International on May 24, 2007, and appreciates that both Northeast Marine Pilots and Marine Safety International submitted feasibility evaluations.  Simulated environmental conditions for modeling transit on May 24, 2007 were "ideal," and an experienced Northeast Marine Pilot was controlling the vessel, yet it appeared to me that the stern tug came unacceptably close to the fender of the new Brightman Street Bridge (an exact determination could not be made due to the inherent limitations of the simulator).  As discussed above (and as confirmed in the simulator), a tethered stern tug is essential to effectively controlling an LNG tanker transiting through the Brightman Street bridges, but it also serves to effectively add to the overall length of the tanker itself, extending the effective length of the proposed tanker to nearly 900 feet, which allows only the narrowest of margins when there is 1100 feet spacing between the two bridges.  The Captain of the Port also observed this maneuver several times during actual transits of the bridges on coal ships destined to or from the NRG power plan in Somerset.

(2) Importantly, the feasibility evaluation of the Northeast Marine Pilots contains a number of caveats and qualifiers that lends only nominal weight to their conclusion that the simulation project "suggests" that tanker transits would be safe.  Both the Captain of the Port's personal observations of the simulations and a close examination of the feasibility evaluations, and substantial personal observations of actual ship transits through this segment of the waterway with pilots and vessel masters, affirm the Coast Guard's determination that the waterway surrounding the Brightman Street bridges is not suitable for routine transits of LNG marine traffic.

(3) Whether assuming the larger 'small tanker' dimension (750' x 85' x 37.5') or the original small tanker dimensions (725' x 82' x 36'), the Coast Guard's navigation safety analysis is similar and leads to the same understanding of the proposal in terms suitability of the waterway for marine traffic of the type and frequency proposed by Weaver's Cove.

(4) The items above are mentioned not to discount the value of simulation modeling, but to highlight that the risk-free value of simulation must be appropriately weighed, and

is only one of many components considered in evaluating the suitability of the waterway for LNG marine traffic. The probabilities associated with human factors, mechanical factors, and environmental factors which must be precisely aligned for a safe transit through the Taunton River are critically important, but not addressed in the scope of the submitted analysis. While the simulations may suggest that safe transits are feasible, they offer no substantive analysis that such transits can be routinely performed safely, do not account for historical accidents, do not account for relevant human error and mechanical failure probabilities, and certainly do not demonstrate that the waterway itself is suitable for such transits.

i.  Coal Ships:  The LNG vessels proposed by Weaver's Cove are not comparably sized with coal ships currently transiting the waterway, nor would the proposed LNG vessels carry cargo of comparable risk.  Table 3 below provides a comparison between currently transiting coal ships and the proposed LNG tankers.

Table 3 – Comparison of Coal Ships to Proposed LNG Tankers

| Largest vessel transiting Brightman St. bridges: | Coal vessel | Proposed LNG vessel | Difference (absolute) | Difference (percent) |
|---|---|---|---|---|
| Length | 539.14 feet (M/V Winterset) | 750 feet | 210.86 feet | 39.11 |
| Beam | 77.76 feet (M/V Clipper Ranger) | 85 feet | 7.24 feet | 9.3 |
| Draft | 28.5 feet (M/V Winterset, & M/V Clipper Ranger) | 37.5 feet | 9 | 31.6 |
| Approximate displacement (metric tons) | 28,000 (M/V Winterset) | 43,000 (modeled vessel, which is smaller than the proposed vessel) | 15,000 | 53.6 |
| Number of total annual deliveries | 25 | 120-130 | 95-105 | 380-420 |
| Flammable cargo as defined in 33 CFR §154? | No | Yes | N/A | N/A |

j.  Given the characteristics of the waterways, particularly its narrowness, off-set channel, and close proximity of bridges to each other, any safety and security zone encompassing a tanker would effectively stop all marine traffic in the Taunton River during the vessel's transit through the old and new Brightman Street bridges.  The period of marine traffic stoppage was not evaluated for the condition of two Brightman Street bridges (with offset openings) in place, and for 260 bridge transits.  Stoppage of vessel traffic to permit frequent transits of LNG tankers could adversely impact navigation safety, particularly for vessels subject to transit restrictions through the old Brightman Street Bridge (wind,

flood current, sufficient tide, daylight, etc.), and for vessels that would have to exit the relative safety of the navigation channel and await the LNG tanker's passage in less-safe waters outside the channel.

k.  There is very minimal room for tugs and escort vessels to react to a loss of power or steering error under the Braga Bridge or through the Brightman Street bridges.

l.  In conducting this analysis due consideration was given to the various measures proposed by Weaver's Cove to mitigate risk to navigation safety.

m.  In conclusion, of the entire proposed transit route, the area of highest apparent potential consequence in the case of accident or incident—the Fall River/Somerset metropolitan area of the Taunton River—is also the area of highest navigational safety risk. The sum of measures, mitigations and precautions described in the Weaver's Cove proposal are not sufficient to reduce the risks to a point where the waterway can be declared suitable for the proposed cargo transits.

D.  RECOMMENDATIONS:

1.  <u>Recommendation as to suitability:  Transit Route Segment One:</u>  Although the navigational safety aspects of LNG tanker transits on this segment of the route are not addressed in detail in this letter, vessels of similar dimensions as those proposed by Weaver's Cove, and carrying hazardous cargoes, currently transit along this segment enroute the Port of Providence, RI.  The impacts of frequently arriving and departing 'small LNG tankers', as proposed, has not been addressed specifically.  Because of the issues with waterway Segments Two and Three described throughout this document, and below, further analysis of the navigational safety aspects of Segment One is not pursued. Therefore, I offer no recommendation as to the suitability of this segment.

2.  <u>Recommendation as to suitability:  Transit Route Segment Two:</u>  It is possible that LNG transits could be safely conducted from Sandy Point northeasterly to the line approximately between Mount Hope Point and Common Fence Point.  Northeast of that line, however, the channel becomes restricted, particularly by width and depth.  As the channel is only 400 feet wide from the above described line for about 4 ¼ miles until north of the Braga Bridge in Segment Three, and then 600 feet wide north of the Braga Bridge but narrowing to 98 feet at the old Brightman Street bridge, any northbound LNG tanker of the size proposed by Weaver's Cove cannot be turned around until the ship reaches the turning basin adjacent to its destination.  Thus, any casualty disabling an LNG tanker occurring in the northeast portion of Segment Two would present two unattractive options:  either back the ship out, into Segment One, which would require a rather extraordinary navigational maneuver or second, tow the ship under the Braga Bridge and through the Brightman Street bridges, to be turned around in the vicinity of Weavers Cove.  Given my recommendations regarding Segment Three, described below, any casualty requiring a dead-ship towing evolution into Segment Three may present an unacceptable risk of another, more significant casualty.  Therefore, my recommendation is that Segment Two is UNSUITABLE for the transit of LNG tankers as proposed.

3. <u>Recommendation as to suitability: Transit Route Segment Three</u>: Segment Three presents numerous navigational safety challenges, as described in this analysis, including, but not limited to: the transit in the vicinity of the Braga Bridge, USS MASSACHUSETTS and Battleship Cove, and the transit between the two Brightman Street Bridges. After carefully reviewing the record, reviewing the provided simulation and modeling data, conducting analysis of navigation safety parameters, and considering my personal observations of vessels being navigated through this waterway segment, it is my conclusion that transits of LNG vessels of the dimensions proposed, at the frequency proposed, cannot be safely conducted on a routine, repeatable basis, and that the risk of a casualty is unacceptably high. Therefore, my recommendation is that waterway Segment Three is UNSUITABLE for the transit of LNG tankers as proposed.

4. <u>Overall recommendation as to suitability</u>. Given that I recommend that segments 2 and 3 of the proposed route are unsuitable for the transit of the proposed LNG tankers, my overall recommendation is that the waterway northeast of the line between Mt. Hope Point and Common Fence Point is UNSUITABLE for the transit of the proposed LNG tankers. In making this ultimate recommendation, I have considered the factors listed in 33 CFR §127.009, as described throughout this document.

5. <u>Recommendation as to action in the event of LNG transits</u>. In addition to analyzing the specific requirements set forth in 33 CFR §127.009, I have taken into account my overarching responsibilities as Captain of the Port, Federal Maritime Security Coordinator, and Federal On-Scene Coordinator. See, e.g., 33 C.F.R. §§ 3.01-1 (d)(1), 3.05-20, Executive Order 10173, 33 U.S.C. § 634, 33 U.S.C. § 1221, et seq. (the Ports and Waterways Safety Act of 1972, as amended); 50 U.S.C. § 191 (the Magnuson Act), 46 U.S.C § 70101, et seq. (the Maritime Transportation Security Act of 2002, as amended) and 40 C.F.R. Part 300 (the National Response Plan). Based on my thorough review of the facts before me, even without the Letter or Recommendation process of Part 127, to fulfill my responsibilities to ensure the safety of the waterway, I would feel compelled to use my discretionary authorities to control vessel movements to prohibit the recurrent transit of LNG tankers from northeast of the line between Mt. Hope Point and Common Fence Point, under the Braga Bridge and through the Brightman Street Bridges and to the north of those bridges in the Taunton River.

Appendices:
A: Chartlet of Waterway Segment One
B  Chartlet of Waterway Segment Two
C  Chartlet of Waterway Segment Three



Sandy Point

Newport/Pell Bridge

East Passage

Waterway Segment One, from "NB" entrance buoy to Sandy Point, approximately 12.5 nautical miles long

"NB" Entrance Buoy

Chart Name:    NARRAGANSETT BAY  RI-MA
Chart ID:      13221_1

APPENDIX A:  CHARTLET, WATERWAY SEGMENT ONE

® MAPTECH, INC.



Borden Flats

Brayton Point Channel

Mount Hope Bridge

Waterway Segment Two, from Sandy Point to Borden Flats, approximately 9.6 nautical miles long

Sandy Point

Chart Name:     NARRAGANSETT BAY  RI-MA
Chart ID:       13221_1
Top Left:       41° 43' 32" N  71° 22' 39" W
Bottom Right:   41° 36' 8" N  71° 7' 58" W

© MAPTECH, INC

APPENDIX B:  CHARTLET, WATERWAY SEGMENT TWO



**APPENDIX C: CHARTLET, WATERWAY SEGMENT THREE**

# Exhibit L



U.S. Department of
Homeland Security
**United States
Coast Guard**

# BRIDGE PERMIT

## AMENDMENT
### (8a-97-1)

AUG 2 3 2000

**WHEREAS** by a permit issued on 5 December 1997, the Commandant of the Coast Guard approved the location and plans of a bridge to be constructed by the Commonwealth of Massachusetts across the Taunton River between Fall River and Somerset, Massachusetts, under authority of the General Bridge Act of 1946, as amended;

**AND WHEREAS** condition 1 of that permit provides that no deviation from the approved plans may be made either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Commandant, and condition 8 fixed the time for completing construction of the bridge project at 5 December 2002 and the - **COMMONWEALTH OF MASSACHUSETTS** - has submitted for approval revised plans indicating modification to the previously approved plans and also requests that the time for completing construction of the bridge project be extended;

**NOW THEREFORE,** This is to certify that plan sheets 2 and 5 (of 5) revised May 2000 hereby approved supersede plan sheets 2 and 5 (of 5) dated February 1997 previously approved and supplement plan sheets 1, 3, and 4 dated February 1997 previously approved. In granting this approval, all conditions to which the original permit was subject are superseded by the following conditions:

1.    No deviation from the approved plans may be made either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Commandant.

2.    The construction of falsework, cofferdams or other obstructions, if required, shall be in accordance with plans submitted to and approved by the Commander, First Coast Guard District, prior to construction of the bridge. All work shall be so conducted that the free navigation of the waterway is not unreasonably interfered with and the present navigable depths are not impaired. Timely notice of any and all events that may affect navigation shall be given to the District Commander during construction of the bridge. The channel or channels through the structure shall be promptly cleared of all obstructions placed therein or caused by the construction of the bridge to the satisfaction of the District Commander, when in the judgment of the District Commander the construction work has reached a point where such action should be taken, but in no case later than 90 days after the bridge has been opened to traffic.

AUG 2 3 2000

**Bridge across the Taunton River between Fall River and
Somerset, Massachusetts**

BRIDGE PERMIT
**AMENDMENT**
(8a-97-1)

3.    Issuance of this permit amendment does not relieve the permittee of the obligation or responsibility for compliance with the provisions of any other law or regulation as may be under the jurisdiction of the U. S. Army Corps of Engineers, New England Division; U. S. Department of Commerce, National Marine Fisheries Service; State of Massachusetts: Department of Environmental Protection; Division of Marine Fisheries, or any other federal, state or local authority having cognizance of any aspect of the location, construction or maintenance of said bridge.

4.    The location of, and materials to be used in construction of, the pier protection fender system as shown on the approved plan sheet 4 (of 5) dated February 1997 and sheets 2 and 5 revised May 2000 shall be submitted to the District Commander for approval prior to commencing construction of such system.

5.    Clearance gauges shall be installed and maintained in a good and legible condition by and at the expense of the owner of the bridge. The type of gauges and the locations in which they are to be installed will be submitted to the District Commander for approval.

6.    In-water construction activities associated with this project shall cease in their entirety from 15 February through 15 June of each year that work on the project continues. This moratorium is intended to preclude disruption of fish migration and to keep fishery resource harms and losses to a minimum.

7.    All parts of the existing to-be-replaced bridge across the Taunton River, mile 1.8, not utilized in the new bridge shall be removed down to or below the natural bottom of the waterway, except that all parts of the bridge 200 feet on either side of the centerline of the channel shall be removed down to or below an elevation of 40 feet below Mean Low Water and the waterway cleared to the satisfaction of the District Commander. Such removal and clearance shall be accomplished as prescribed by the District Commander at any time there is no Federal law prohibiting the removal of the bridge. Should the permittee decide to retain the west abutment or any portions of the bridge, for any reason, the permittee must first obtain permission from the U. S. Army Corps of Engineers, New England Division, or any other authority having cognizance over structures other than bridges in navigable waters of the United States.

8.    When the proposed bridge is no longer used for transportation purposes, it shall be removed in its entirety or to an elevation deemed appropriate by the District Commander and the waterway cleared to the satisfaction of the District Commander. Such removal and clearance shall be completed by and at the expense of the owner of the bridge upon due notice from the District Commander.

Continuation Sheet

**Bridge across the Taunton River between Fall River and Somerset, Massachusetts**

AUG 2 3 2000

BRIDGE PERMIT
**AMENDMENT**
(8a-97-1)

9.     The approval hereby granted shall cease and be null and void unless construction of the bridge is completed by 5 December 2010.


N. E. MPRAS
Chief, Office of Bridge Administration
U. S. Coast Guard
By direction of the Commandant

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Weaver's Cove Energy, L.L.C. | Thad W. Allen, Commandant of the United States Coast Guard, in his official capacity, et al. |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF (EXCEPT IN U.S. PLAINTIFF CASES) Fall River, MA | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT (IN U.S. PLAINTIFF CASES ONLY) Washington, D.C. NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) Jeffrey M. Bauer Baker Botts LLP The Warner 1299 Pennsylvania Avenue, NW Washington, DC 20004-2400 | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)

◉ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ A. Antitrust
- ☐ 410 Antitrust

○ B. Personal Injury/ Malpractice
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

◉ C. Administrative Agency Review
- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Mandamus Act, 28 U.S.C. § 1361; Declaratory Judgment Act, 28 U.S.C. § 2201

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $** _____   Check YES only if demanded in complaint   **JURY DEMAND:**   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 6/10/08    SIGNATURE OF ATTORNEY OF RECORD _[signature]_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.